**CONSOLIDATED EQUIPMENT SALES, INC., Appellant,**

v.

**FIRST STATE BANK & TRUST COMPANY OF GUTHRIE, Oklahoma, Appellee.**

No. 52449.

Supreme Court of Oklahoma.

March 24, 1981.

---

**434**

Rheam, Noss & Evans, David L. Noss and Larry Evans, Tulsa, for appellant.

Williams & Hirzel by Thomas R. Williams, Guthrie, for appellee.

DOOLIN, Justice:

This case asks us to interpret the Uniform Commercial Code to allocate rights in collateral among a Bank, a Paving Contractor and an Equipment Sales Company.

### I—Facts

J. Ted McBride, an asphalt and paving contractor (McBride), acquired an Allis-Chalmers 645 wheel loader from Consolidated Equipment Sales, Inc. (Consolidated), in November 1973. Both executed a sales contract *and* a lease contract for the identical equipment, and under identical terms ($843.65 per month over sixty [60] months), with an identical sale/lease price ($50,619.00 including interest). The sales contract included trade-in allowance for a tractor loader. Both contracts were signed by McBride and Frank Hininger, Consolidated's Branch Manager. Consolidated argues the sales contract was negotiated first, but voided when its credit manager refused to approve the credit arrangements because of McBride's credit rating. The lease was then negotiated. Consolidated does not explain why the sales contract was never voided on its face, or destroyed.

The ownership of this wheel loader is the major issue.

Earlier that same year McBride and the appellee bank (Bank) negotiated two loans and Bank properly filed financing statements (in February and August 1973) listing as security (1) "All paving equipment and grading equipment now owned, hereafter acquired or better described" and (2) "All machinery, trucks, rollers, pavers, graders, dozers, dump trucks, pickup, concrete equipment, now owned or hereafter acquired."

Consolidated admits it does not qualify as a holder of a purchase money security interest which would fix priority in it, because it filed a financing statement more than ten days following delivery of the wheel loader. 12A O.S.1971 § 9–301(2), § 9–312(4).

McBride encountered financial problems and filed bankruptcy in August 1975.[1] Shortly thereafter (November 1975) the wheel loader was found missing from McBride's business site and was later located at Consolidated's shop. Consolidated repaired the wheel loader, insured it for $38,000.00, leased it for six months and then sold it for $28,400.00.

Meanwhile, Bank sued McBride on several defaulted notes, and in July 1976, won a judgment of $84,000.00. In September 1976 —six weeks after entry of the judgment— McBride agreed to personally guarantee to the Bank the payment of the judgment, said agreement coming in the form of a "personal assumption agreement," and assigned to Bank his interest in the wheel loader.

The Bank then filed this cause, a conversion suit against Consolidated for the value of the wheel loader.

### II—Sale or Lease

■ We must initially decide whether the transfer of the wheel loader from Consolidated to McBride was a sale or lease, for a pure lease might uphold Consolidated's claim to the collateral.[2]

---

1. Bankruptcy referee disclaimed all interest in collateral involved in this case.

2. The UCC does not specifically exclude true leases, but certain sections (§ 9–102 and § 1–201[37]), read as a whole, intimate such. See "Uniform Commercial Code, Second Edition," White and Summers (1980), § 22–3. Also see "Equipment Leases as Collateral under the UCC and the New Bankruptcy Code," by Daniel A. Gutterman, 12 Uniform Commercial Code Law Journal 344, 348 (Spring 1980).

The trial court, in a well-written "findings of fact and conclusions of law," used the following criteria in determining the transaction was a sale: Consolidated gave credit on a trade-in; it took full payment of the sales tax in advance; it assessed interest in advance; Consolidated, upon request, sent to Bank a letter indicating a "payoff" balance on the collateral; payments under the lease were identical to those under the sale; it was the "intent" of the parties as deduced from the evidence. The court concluded the lease agreement was designed by Consolidated as a security device to protect its collateral in the hands of a financially shakey buyer.

Consolidated argues the sales contract, signed first by the parties, was rejected by the company's credit manager the same day it was signed; the parties then entered into a lease agreement. The sales contract did indeed contain a clause making it subject to approval by the credit department. However, Consolidated offers no explanation why the sales contract was not voided on the spot when the credit was disallowed and the lease contract signed, and there is no indication on the sales contract itself that the credit manager disapproved credit for McBride.

Consolidated disputes the trial court's criteria for determining the transaction was a sale. On the charging of sales tax, it notes 68 O.S.1971 § 1302(c) defines a "sale" to include a "lease or rental of tangible personal property whether such exchange, barter, lease or rental results in either the transfer of the title or the possession." It argues the lease installment terms were identical because the value of the wheel loader following the five-year lease would be less than ten per cent of its sales value. It also notes there was no option to purchase and no agreement that McBride should take title to the wheel loader when the lease expired. Consolidated said its response to the Bank as to a "payoff" said nothing about a sale or lease, only that McBride still owed so much on the lease, which it thought the Bank might want to include in its refinancing arrangement with McBride.

The Code's pertinent mention of "lease" is when it speaks of a lease taken as a security interest at 12A O.S.1971 § 1–201(37):

"... Whether a lease is intended as security is to be *determined by the facts of each case*,[3] however, (a) the inclusion of an option to purchase does not itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security." (Emphasis added).

Neither of the above two conditions (a and b) is present from the evidence; in fact, the trial court found specifically there was no option to purchase.

Consolidated briefs this proposition of error as if there existed no sales agreement, and that the only issue was whether the lease contract was a true lease or a lease taken as security interest. If this were the case, its arguments would have merit. But the lease contract is not alone; it is coupled with a sale contract. When construing both contracts together and upon consideration of the evidence, we conclude the trial court's judgment entry was sustained by sufficient evidence to find that a sale was intended by the parties. We find therefore the trial court's finding that a sale was intended was not clearly against the weight of the evidence.[4]

---

3. At least one commentator has concluded that "facts" should mean outward appearance of facts.

  "Leases of Equipment and Some Other Unconventional Security Devices: An Analysis of UCC Section 1–201(37) and Article 9," by Peter F. Coogan, 1973 Duke Law Journal, page 909; "Uniform Commercial Code," 2nd Edition, 1980, White and Summers, § 22.3, pg. 882.

4. *National Bank of Commerce v. First National Bank and Trust Company of Tulsa*, 446 P.2d 277 (Okl.1968), 30 A.L.R.3rd 1.

## III—Description

Was the wheel loader adequately described in the Bank's two financing statements so as to give Bank priority in the collateral over Consolidated as after-acquired property?[5]

Consolidated argues the specific descriptions of "all machinery", "paving equipment" and "concrete equipment" were insufficient to include the wheel loader; that only specific identification of the wheel loader or a general description of "equipment" would warrant giving Bank priority in the collateral.

Section 9–110 notes that a "description" of personal property is sufficient "whether or not it is specific if it *reasonably identifies* what is described." (Emphasis added).

Section 9–402(1) says, "A financing statement is sufficient if it . . . contains a statement indicating the types, or describing the items, of collateral . . ." The official comment to this section attempts to explain the reasoning for description of "types":

"This Section adopts the system of 'notice filing' . . . What is required to be filed is not . . . the security agreement itself, but only a simple notice which may be filed before the security interest attached or thereafter. The notice itself indicates merely that the secured party who has filed may have a security interest in the collateral described. Further inquiry from the parties concerned will be necessary to disclose the complete state of affairs . . ."

█ It is thus evident that only notice sufficient to place the inquiring party on guard to further inquiry is all that is required of the financing statement; it need not describe the collateral in exacting detail. Thus a description of "all equipment" in a service station was sufficient to include an adding machine. *American National Bank & Trust Co. of Sapulpa v. National Cash Register Co., 473 P.2d 234 (Okl.1970).*

█ Testimony reveals that the wheel loader was used in McBride's paving and asphalt business to prepare the road surface by scooping dirt and depositing it in a dump truck. The Bank's loan—as evidenced on its financing statement—was made to McBride in his capacity as owner of the paving business. This alone should have been sufficient to put Consolidated on notice to inquire further into Bank's financing statement reference to after-acquired property.

We find the description of "all machinery", "paving equipment" and "concrete equipment" was sufficient to include the wheel loader, and place other parties on notice to inquire further.

## IV—Personal Assumption Agreement

We are next asked to decide the legal consequences of a "personal assumption agreement" entered into between Bank and McBride which Consolidated discovered during trial.

The "Personal Assumption Agreement" was concluded September 7, 1976. Its three pages (summarized here) make the following points:

Bank had just been granted an $84,000.00 judgment against McBride for default on earlier notes, secured by certain items of personal property. Between the judgment and this agreement, McBride was declared bankrupt; Bank was given first security in some of the collateral, and second security in other items of the collateral. The agreement recited McBride claims ownership of the wheel loader in question, and the Bank is entitled to possession under the 1973 security agreements. McBride agreed to assume personal responsibility for the judgment and to guarantee its payment, within one year, with interest and attorney fees. Bank agreed to sell the collateral in which it was granted a first security interest and apply the proceeds to the judgment. Bank also agreed to apply proceeds, if any, from sale of collateral in which it held second security interests and from sale of the wheel loader should it be successful in its cause of action against Consolidated, against the judgment. McBride agreed to

5. 12A O.S.1971 § 9–402(1).

cooperate with Bank in its action against Consolidated and to testify on behalf of the Bank in a truthful manner. McBride waived notice of sale by Bank of the collateral and agreed that the Bank itself might purchase the collateral at its own private sale. Three days after the "Agreement" was consumated, the Bank did in fact purchase the collateral at its own private sale, leaving a balance left on the judgment of some $37,000.00.

On the date of the "Agreement", Bank formalized acquisition of its first security collateral by having McBride sign a "Bill of Sale", and a Bank officer signed a "Return of Sale of Secured Goods", listing the amount received from the sale as $42,-000.00, leaving a balance owed of $41,983.00 which after subtracting several credits came to a total owed of $37,194.00 still owed on the judgment.[6]

■ Consolidated argues McBride assigned his claim against Consolidated to Bank, that Bank is only a nominal party at best and not the real party in interest. 12 O.S.1971 § 221. This substitution of parties, argues Consolidated, denied it the right to assert the defense of offset against McBride and denied it other defenses.

We find no evidence Consolidated objected to the party-plaintiff at any time prior to trial (it did so after discovery of the "agreement") and did not seek to join McBride as co-counter-claimant pursuant to 12 O.S.1971 § 243.

McBride had already divested himself of the wheel loader, either to Bank through the after-acquired clause in the 1973 security agreement or to Consolidated through his default on the five-year installment purchase agreement. Both Bank and Consolidated claimed the collateral through opposing financing statements. Bank had a true interest in the outcome and stood to gain or lose collateral for its loan, as did Consolidated.

Consolidated's solution would have been to join McBride.

We find Consolidated's arguments unconvincing and find that the parties were properly aligned.

### V—Notice of Private Sale

■ Consolidated's next proposition of error argues that when Bank and McBride entered into their personal assumption agreement, the Bank intended to place Consolidated in the shoes of the debtor McBride by looking to Consolidated for the $37,-000.00 deficiency in payment of McBride's judgment to Bank by reason of the collateral conversion. Further, since Consolidated was placed in McBride's shoes as debtor, it contends it was entitled to notice of the private sale at which Bank sold McBride's collateral to itself, leaving the $37,000.00 deficit which Consolidated is now asked to pay. Along with notice, Consolidated argues the sale should have been commercially reasonable, with the collateral advertised, cleaned and repaired.

Consolidated notes 12A O.S.1971 § 9–504(3) requires notice of any sale—public or private—be given to the debtor "and to any other person who has a security interest in the collateral ..." It also notes that "debtor" is defined at section 9–105(1)(d) to include "the person who owes payment or other performance of the obligation secured" and "the owner of the collateral." The purpose of notice, points out Consolidated, is to give the debtor a chance to protect himself from an inadequate sale price, and because Bank intended to look to Consolidated for the deficiency, it intended to place Consolidated in the shoes of the debtor and therefore should have given Consolidated notice of the private sale.

The vice of this argument is that Consolidated had no interest whatsoever in the collateral sold at the private sale; its only interest was in the wheel loader which was not part of the collateral sold to Bank as it was in possession of Consolidated. McBride merely assigned his interest in the wheel loader to Bank.

It is indeed possible that Bank and McBride fixed the deficiency after the pri-

---

6. 12A O.S.1971 § 9–504(3).

vate sale at $37,500.00 assuming that would be paid if it won judgment against Consolidated for conversion of the wheel loader. That does not make it any less valid for the conversion suit had nothing to do with the other collateral; it represented an independent action by Bank against Consolidated with both claiming a prior perfected security interest in the wheel loader.

We find Consolidated, having no interest in McBride's collateral sold at private sale, had no right to notice of the sale.

## VI—Measure of Damages

The trial court set the measure of damages for conversion of the wheel loader at $26,200.00.

Strictly speaking, we do not find the repossession in this to be one of "conversion" of the collateral, although the end result is identical. Consolidated, as a secured party, albeit second in priority to Bank apparently had secured the right under the Code to repossess the wheel loader: Section 9–503 makes no distinction between secured parties of graduated priorities; it simply authorizes "a secured party" to repossess the collateral via self-help, and makes no requirement that the secured party hold first priority status.[7] (Emphasis added).

■ However, once it achieved repossession, Consolidated, as the junior secured party, had an obligation to turn proceeds of the sale of the collateral over to Bank as the senior secured party. 12A O.S.1971 § 9–312(5)(a), 306(2).[8] Failure to so act is a conversion. *Davidson v. First Bank and Trust Company, Yale, 609 P.2d 1259 (Okl. 1976).*

Authority for damages for conversion comes from failure to comply with the default procedures of section 9–501 et seq. which brings into play section 9–507(1) provisions for reimbursement of losses suffered as a result of such failure on the part of the junior secured party. Therefore, the trial court's end result was correct, as will be seen shortly.

An employee of Consolidated testified at trial the wheel loader's value at time of repossession by Consolidated was between $15,000.00 and $20,000.00 because it was in poor condition. He also testified its value, in top condition fully repaired and clean, would be $32,000.00. Consolidated testified it made repairs worth $5,800.00 after repossession, leased the wheel loader for six months and re-sold it for $28,400.00. The trial judge apparently arrived at his $26,200.00 figure by taking the value of the wheel loader in top condition, and deducting the cost of repairs and cleaning. He found Consolidated had a duty to mitigate damages by placing the collateral in top condition prior to resale.

Consolidated argues the proper measure of damages assuming liability, should be the value of the converted item at the time and place of conversion, citing 23 O.S.1971 § 64, and that there is no duty to mitigate damages in this fact situation. It argues to hold otherwise results in "unjust enrichment" for Bank.

However, would it not also be "unjust enrichment" to allow the converter to make a profit from his conversion? Such would be the case if we allowed damages of $15,000.00 to $20,000.00 while Consolidated sold the collateral for $28,400.00 after leasing it for six months.[9]

■ Normally we would agree with Consolidated that 23 O.S.1971 § 64 should apply, and the value at the time and place of conversion would be the measure of damages. But in this case, wherein the converter took it upon itself to upgrade the collateral and sell it for a higher value, we find the trial court made the correct decision, not because Consolidated had a duty to mitigate but because it should not be permitted to profit from its conversion.

AFFIRMED.

---

7. Also see *Western National Bank of Casper v. ABC Drilling Company, Inc.,* 42 Colo.App. 407, 599 P.2d 942 (1979).

8. Also see 30 A.L.R.3d 9, "Construction and Effect of UCC Art. 9, Dealing with Secured Transactions . . ."

9. Bank makes no claim to the lease money.

IRWIN, C. J., BARNES, V. C. J., and WILLIAMS, LAVENDER, SIMMS, HARGRAVE and OPALA, JJ., concur.