**NOLIN PRODUCTION CREDIT ASSOCIATION, Appellant,**

v.

**CANMER DEPOSIT BANK (Now Pioneer Bank), and W.E. Vance and Sue Vance, Appellees.**

Court of Appeals of Kentucky.

Oct. 17, 1986.

Rehearing Denied Jan. 30, 1987.

Discretionary Review Denied
by Supreme Court
April 21, 1987.

Dwight Preston, Lewis, Bland & Preston, Elizabethtown, for appellant.

Robert B. Hensley, James I. Howard, Hensley, Dunn & Ross, Horse Cave, James C. Ladd, Munfordville, Glay E. Maggard, Munfordville, for appellees.

Before CLAYTON, COOPER and HOWARD, JJ.

CLAYTON, Judge.

This appeal involves a dispute between two secured creditors over the priority of certain liens on the farm equipment and livestock of bankrupt debtors, W.E. Vance and his wife, Susan.[1] In its 1983 judgment, the court below determined that Canmer Deposit Bank (now "Pioneer Bank") was entitled to approximately two-thirds of the proceeds from the sale of the equipment, or $10,778. By a later 1985 judgment, the Hart Circuit Court further granted a $97,-447 award against Nolin Production Credit Association ("Nolin", "Nolin PCA", or "PCA") to Pioneer Bank based upon the sale of certain livestock found to be included in the after acquired property clause of the bank's 1975 security agreement. Now on appeal, PCA argues: 1) that the language of its February 11, 1977 security agreement was not so indefinite as to be unenforceable; 2) that Pioneer failed to prove that the after acquired property clause of its 1975 agreement was intended to apply to *all* subsequently purchased cattle, including trading cattle; 3) that Pioneer should have been held to be equitably estopped from asserting its claim to proceeds from the cattle sales occurring between 1975 and 1980; 4) that the circuit court used the wrong measure of damages; and 5) that it further charged the wrong interest rate upon the 1985 judgment.

On July 22, 1970, W.E. Vance executed a promissory note to Pioneer for $17,500 at 7% interest. This debt was subsequently

---

1. Unless provided otherwise, all citations to KRS Chapter 355, the Kentucky Codification of the Uniform Commercial Code, refer to those sections as in effect prior to the 1986 legislative revision of the Chapter.

secured by a financing statement filed February 28, 1975. By its terms, the statement covered,

> All livestock and farm machinery including but not limited to: Two hundred head holsteins, ages six months to nine years, one hundred fifty head mixed herefords, ages six months to seven years, Model 3020 John Deere Tractor, Model 175 Massey Ferguson Tractor, Model A John Deere Tractor and equipment,

An after acquired property provision found in the same statement provided for security on all proceeds from this property and all similar after acquired property.

Approximately 10 years after his initial loan and five years after the filing of the security agreement, Vance consolidated two subsequent loans made in 1975 and 1979 executing a $59,711 promissory note to the bank on March 27, 1980 at 16% interest. A second financing statement was simultaneously filed, including as collateral,

> All livestock and farm machinery including but not limited to: 247 head holsteins, ages 2 months to springing heifers and six bulls, one registered Brahma bull—Model 4020 John Deere Tractor, 330 John Deere Tractor, 60 John Deere Tractor, 175 Massey-Ferguson Tractor and all equipment.

As with the earlier statement, an identically worded after acquired property clause was included in the document. It is undisputed on appeal that this second financing statement was not filed as a continuation statement and that the bank's initial security agreement had lapsed as of the date of the filing of the second statement.

During the five year interim between the filing of these statements, Vance executed to PCA some thirteen separate promissory notes on debts totalling nearly $328,000. To secure these debts, two mortgages and seven separate financing statements were filed by PCA between 1975 and 1980. For our purposes, however, we need only examine three of the seven statements. The first, filed on September 28, 1976, lists as collateral "all beef cattle including but not limited to Angus and Hereford." The second security agreement, filed February 7, 1977, lists "all farm machinery and equipment, including but not limited to tractor [sic]" as collateral. Finally, the third agreement of August 25, 1977, lists "all dairy cattle including but not limited to Holsteins" as collateral. The remaining four financing statements refer simply to specific items of farm machinery or personal vehicles not now in dispute.

On April 16, 1981, Pioneer brought action against Vance and the PCA seeking recovery upon the delinquent 1970 and 1980 promissory notes and their corresponding security agreements. Nolin Production Credit Association answered asserting a $292,062 cross-claim against Vance, and further alleging a prior and superior security interest in all the collateral described in its security agreements with Vance. Upon agreement of the parties, certain farm equipment and machinery was sold at auction in late 1981 and mid–1982 with the proceeds of the sales, some $15,713, being placed in escrow. Pioneer, by amended complaint of December 15, 1982, additionally sought recovery of certain proceeds from the sale of cattle collateral by Vance between 1975 and 1980. As the PCA explains this allegation, Vance, with the knowledge of Pioneer, and the financing of PCA, had over the five year time period made repeated purchases and sales of "trading" cattle using monies borrowed from the PCA. All sale proceeds were apparently remitted to the PCA. It is undisputed that the PCA took no purchase money security interest in the "trading" cattle and that it relies solely on its 1976 and 1977 security agreements as the basis for its interest.

On October 2, 1983, the Hart Circuit Court entered its initial interlocutory judgment (later incorporated into its final judgment of July 26, 1985). By that judgment, the court specifically determined that Nolin was entitled to immediate possession of two 1979 pickup trucks, but that Pioneer was to be granted the proceeds from the sale of the collateral described in its 1980 financing statement. Although the 1980

statement was specifically found *not* to be a continuation statement, the court determined that the description of collateral found in the PCA statements of 1976 and 1977 was of so general and nondescript a nature that Pioneer was entitled to the sale proceeds representing the collateral as described in its 1980 statement. Any proceeds not traceable to collateral described in the Pioneer financing statement of 1980 were to be divided equally between the creditors, the court being unable to "decipher the extent or priority of the other's lien." As a result of this judgment, Pioneer received $5,842.50 from the sale of two tractors described in its 1980 statement and $4,935.22 representing one-half of the balance of the $15,712.94, total sale proceeds from the two auctions. Nolin PCA received $4,935.22.

On July 25, 1985, the circuit court entered its second, and final, judgment awarding Pioneer some $97,447, and the outstanding balance of the 1970 and 1980 promissory notes. As a basis for this award, the trial court reasoned that the PCA had converted Pioneer's collateral through its receipt and retention of cattle sale proceeds from the sales of "trading" cattle during the 1975–1980 interim. Interpreting the after acquired property clauses of both parties' financing statements, the court found that the clause as set out in Pioneer's 1975 financing statement included *all* cattle purchased and sold by Vance between 1975 and 1980, a finding which the PCA strongly disputes based upon the deposition testimony of certain bank officers. The lower court then went on to reject Nolin's claim that Pioneer had waived, or was equitably estopped, from asserting its after acquired property interest due to its failure to act during the five year period. In reaching this holding, the circuit court relied upon *Burlington National Bank v. Strauss*, 50 Wis.2d 270, 184 N.W.2d 122 (1971). As a result of this reasoning, Pioneer was granted a judgment against Nolin for $6,849.90, the indebtedness on the first note, plus interest at a rate of 7% interest per annum from August 10, 1983, to July 25, 1985, with interest thereafter at 12% per annum. A further award was made to

Pioneer of $90,597.11, the balance due on the 1980 renewal note, plus interest at a rate of 16% per annum from December 31, 1983, until paid. From this second and final judgment of July 25, 1985, Nolin Production Credit Association took timely appeal to this Court.

## I.

### THE DIVISION OF SALE PROCEEDS FROM THE SALE OF FARM IMPLEMENTS AND EQUIPMENT

Appellant first maintains that the trial court erred in holding the language of its February 11, 1977 agreement to be so indefinite as to be unenforceable. As earlier noted, that language provides for an interest in,

All farm machinery and equipment including but not limited to tractor [sic] and all property similar thereto.

Under KRS 355.9–110, of our state's codification of the Uniform Commercial Code (UCC),

... any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described.

In the context of security agreements, KRS 355.9–402(1) additionally includes in the requirements for a sufficient security agreement the proviso that the agreement "contain a statement indicating the types, or describing the items of collateral." Thus, the first question we resolve is whether PCA's description of the collateral satisfies KRS 355.9–402(1) as applied via KRS 355.-9–110.

As Kentucky legal commentators have noted, our courts have frequently wrestled with the problem of potentially overbroad descriptions without achieving any conclusive answers. Nowka & Leibson, *The Uniform Commercial Code of Kentucky* § 8.2(B), p. 685 (1983). The case law in this area unfortunately raises far more questions than it answers. Both appellant and appellee, however, focus in particular upon *Mammoth Cave Production Credit Association v. York*, Ky., 429 S.W.2d 26 (1968), and *Horse Cave State Bank v. Nolin Pro-*

*duction Credit*, Ky.App., 672 S.W.2d 66 (1984), to support their various positions. The PCA, for its part, views *Horse Cave State Bank* as a liberalizing departure from *Mammoth Cave Production Credit Association;* while Pioneer instead interprets the former opinion, *Horse Cave*, as merely a continuation of *Mammoth Cave* with the distinguishing factor in the present appeal being the unique nature of the farm machinery not referred to in the appellant's agreement. In summary, that machinery included a corn picker, cultivator, hay stacker, stack mover, tobacco setter, bush hog, elevator, manure spreader, grinder mixer, and chisel plow.

■ Our own research on this issue, including a review of federal, bankruptcy, and foreign court decisions as well as those of Kentucky state courts, leads us to two conclusions: first, serious questions exist as to what, if any, continuing vitality *Mammoth Cave* currently holds; and, second, the present test to be applied in circumstances such as those now involved is, in effect, an "inquiry test" under which a description of collateral is sufficient for either a security agreement or a financing statement if it puts subsequent creditors on notice so that, aided by inquiry, they may reasonably identify the collateral involved. This same test has, with the exception of perhaps *Mammoth Cave*, been uniformly applied since the enactment of the UCC in Kentucky.

It first appears in *In re Drane*, 202 F.Supp. 221 (W.D.Ky.1962). In that decision, a description of a bankrupt debtor's collateral as,

1 – 2 pc. living room suite, white,
1 – 5 pc. chrome dinette set, yellow,
　　　 3 pc. panel bedroom suite, lime oak,
1 – 　mattress and springs

was initially held by the referee in bankruptcy to be insufficient to put a member of the general public on notice of the existence of the lien. *Id.* at 222. Overruling the referee, the federal district court held the description to be sufficient noting that,

... an adequate description need not describe the property with utmost particularity, but it is sufficient if the facts shown would enable a third party, assisted by external evidence, to identify it. *Id.* at 224. For decisions following the standard set out in *Drane*, see *American Plating & Mfgr. Co. v. Liberty Nat'l. Bank and Trust*, 468 F.Supp. 103, 105 (1979); *Matter of Cooley*, 624 F.2d 55, 58 (6th Cir.1980); *In re Pendleton*, 40 B.R. 306, 309 (1984).

Almost immediately, however, this standard was called into question by *Mammoth Cave*, in which two secured creditors, Commercial Credit Equipment Corporation and Mammoth Cave PCA, became involved in a dispute over the sale proceeds of a tractor. On April 4, 1963, Mammoth Cave, the first perfected creditor, filed a joint security agreement-financing statement in which it described the collateral for certain previously extended loans to T.S. York, the debtor involved, as,

2. EQUIPMENT on the hereinafter described land:

All farm equipment

\* 　　 \* 　　 \* 　　 \* 　　 \* 　　 \*

4. All property similar to that listed above, which at any time may hereafter be acquired by the Debtor including, but not limited to, all offspring of livestock, additions and replacements of livestock and poultry, and replacements of and additions to equipment and other personal property above described;

\* 　　 \* 　　 \* 　　 \* 　　 \* 　　 \*

The following year, Commercial Credit, who had earlier sold York the disputed tractor, filed its conditional sales contract on April 4, 1963. Subsequent to York's default on both obligations, each creditor succeeded in having a separate judgment entered against him. At the circuit court level, the security interest of Commercial Credit was adjudged superior to that of Mammoth Cave PCA. On appeal, Commercial Credit argued, in part, that the security agreement of Mammoth Cave did not attach to the tractor, as the description involved was not specific enough to include it under KRS 355.9–110. Concluding that the description was so vague and indefinite as not to reasonably identify the tractor, the

former Kentucky Court of Appeals held it to be, in effect, overly inclusive, commenting that,

> It could include anything from a screw driver or garden hoe to the largest machinery. In light of this vague provision it seems doubtful that it was really agreed that tractors and other large farm equipment were to be security for the loan. This seems more like a provision inserted by an over-anxious lending officer to encompass as much security as possible, rather than an actual agreement that a security interest was to attach on all the farm equipment.

*Id.* at 29. Almost immediately following its publication, the decision became the subject of adverse commentary by legal scholars. *See* Note, *Description of Collateral in a Financing Statement: Should it be Required*, 4 Valparaiso U.L.Rev. 205, 216 (1969); Note, *Agricultural Financing Under the U.C.C.*, 12 Ariz.L.R. 391, 394 (1970). When raised in *United States v. First National Bank in Ogallala, Nebraska*, 470 F.2d 944 (8th Cir.1972), to support a challenge to a description including "all farm and other equipment now owned or hereinafter acquired," *Mammoth Cave* was specifically rejected following an extended and insightful analysis. *Id.* at 947.

Our own federal courts have only on one occasion somewhat reluctantly followed the decision and in contrast have, in three separate instances, distinguished it. In *In re Anselm*, 344 F.Supp. 544 (W.D.Ky.1972), *Mammoth Cave*, described as a "minority view interpretation of the Uniform Commercial Code," was relied upon to interpret a financing statement which described the secured collateral as,

> All farm machinery and equipment, including but not limited to tractors, tanks, tilling and harvesting tools.

*Id.* at 545. As in *Drane*, the referee held the security agreement insufficient for failure to identify the farm equipment affected. In reaching this conclusion, he relied upon *Mammoth Cave*. The United States District Court for the Western District of Kentucky, affirming in part and reversing in part, held the description sufficient as to all tractors involved, but insufficient as to: speed feeders, disc tillers, planter parts, grain bed, fertilizer distributor, rotary mower, soil surgeon, disc offset, spray rig and boomer. The opinion then concluded with an extended analysis of whether the phrase "tilling and harvesting tools" encompassed the above excluded farm equipment. According to the court, it did not, as the statement should have included an indication of each "type" of equipment, i.e., mower, reaper and fertilizer. *Id.* at 547.

The next opinion to discuss the issue is *American Plating & Manufacturing Co. v. Liberty National Bank and Trust Co.*, 468 F.Supp. 103 (W.D.Ky.1979). Involving an appeal from a bankruptcy order, the decision raises the question of the sufficiency of a security agreement-financing statement with language covering,

> "All present and future accounts receivable, inventory, equipment, contract rights and chattel paper, whether arising from the sale, lease or other disposition of inventory or the rendition of services, or otherwise, and all returned or repossessed goods related thereto and all proceeds thereof. All inventory now owned or hereafter acquired, whether raw materials, work in process, or finished goods, and all materials and supplies now owned or hereafter acquired and used or usable in connection with manufacturing, processing, servicing, packaging, shipping, storing or selling of any such inventory and all proceeds and products of any of the foregoing."

Noting that the debtor was an ongoing business in which the secured creditor sought to take an interest in *all* its property, the court, citing *Drane*, affirmed the order of the bankruptcy judge and held the description sufficient.

This same reasoning is applied by the United States Sixth Circuit Court of Appeals in *In re Cooley*, 624 F.2d 55 (6th Cir.1980). As with *American Plating & Manufacturing, Mammoth Cave* is distinguished on the basis of the debtor's status as an ongoing business and the use of categories of collateral in the security agreement involved. That particular agreement provided for an interest in,

(a) All inventory of the Borrower, now owned or hereafter acquired;

(b) All contract rights of the Borrower, now existing or hereafter arising;

(c) All accounts receivable of the Borrower, now existing or hereafter arising;

(d) All goods, instruments, documents of title, policies and certificates of insurance, securities, chattel paper, deposits, cash or other property owned by the Borrower or in which it has an interest which are now or may hereafter be in the possession of the Bank or as to which the Bank may now or hereafter control possession by documents of title or otherwise;

(e) Proceeds and products of all of the foregoing; [and]

(f) All machinery and equipment, including machinery and equipment which are or will become fixtures, office supplies, furniture, office and store fixtures, raw materials, work in process, and the proceeds and products of all of the foregoing.

*Id.* at 58. As a result of the above language and the court's reasoning, the involved debtor's lawn care equipment was held to be sufficiently described.

The current Kentucky Court of Appeals most recently had occasion to review KRS 355.9–110 and *Mammoth Cave* in *Horse Cave State Bank v. Nolin Production Credit Association, supra.* In *Horse Cave,* a second creditor bank whose lien on certain farm collateral was adjudged inferior took appeal to this Court arguing that the description in appellee PCA's financing statement was insufficient under *Mammoth Cave* to create an interest in the property involved. That description provided for creation of an interest in,

"all farm machindry [sic], including but not limited to tractor, plow and disc ... plus all property similar to that listed above which at any time may hereafter be acquired by the debtor and replacements of and additions to equipment and other personal property above described ..."

Without expressly identifying exactly what collateral was involved, this Court held the description to be sufficient, focusing upon the qualifying portion "tractor, plow and disc" to hold that such language "gave appellant and other persons notice that PCA's financing statement was intended to cover any tractor, plow and disc owned by the debtor...." *Id.* at 67. Whether disputed farm property of a dissimilar nature was involved is impossible to determine from the face of the opinion.

The final opinion interpreting Kentucky law and *Mammoth Cave* is *Pendleton v. Dealer Warehouse Inc.,* 40 B.R. 306 (Bktr. Ct.W.D.Ky.1984). By a complaint brought in bankruptcy court, Pendleton sought to have declared inadequate a collateral description contained in three financing statements filed by the Farmers Home Administration. Faced with the description of collateral as "all equipment, livestock and proceeds thereof, and proceeds," the court held the description adequate to cover "certain equipment" owned by Pendleton. *Id.* at 309. As a basis for this conclusion, it relied upon the standard set forth in *In re Drane, supra* at 224. The holding of *Mammoth Cave,* on the other hand, was specifically distinguished, ostensibly on the basis that it, as well as *In re Anselm,* involved a security agreement filed as a financing statement so that "no extrinsic evidence was available to a third party seeking identification of encumbered collateral...." *Id.* at 310.

We see no basis for such a distinction. The Official Commentary to both KRS 355.-9–203, relating to the description of collateral in security agreements, and KRS 355.-9–402, pertaining to the requirements for financing statements, make reference to the standard set out in 9–110. Analysis of the Code by Kentucky legal scholars furthermore indicates that the requirements for the sufficiency of description of collateral for both security agreements and financing statements should be identical. *See* Leibson & Nowak, *The Uniform Commercial Code of Kentucky,* § 8.2(B) p. 683 (1983). Given the Official Commentary to the two sections and the frequent practice of creditors in filing joint security agreement-financing statements, a uniform appli-

cation of KRS 355.9–110 to both security agreements and financing statements appears warranted. Therefore, we do not share the view of the Bankruptcy Court as expressed in *Pendleton* that *Mammoth Cave* and *In re Anselm* may be distinguished solely because they involved security agreements filed in lieu of separate financing statements.

Nor does the reasoning set forth in *American Plating & Manufacturing Co.* and *In re Cooley* adequately serve to distinguish the holding of *Mammoth Cave.* Both federal court opinions rely upon the involved debtor's status as an ongoing business and the extensive inclusion of "types" or categories of collateral in their collateral descriptions to support the inapplicability of *Mammoth Cave.* However, this reasoning is perhaps somewhat incomplete when one looks at the supposedly general, or generic, nature of the descriptions involved. If, in fact, *Mammoth Cave* is to be considered correct and such generic descriptions are insufficient, then combining a multitude of overly broad descriptions would more naturally seem to be justification to apply *Mammoth Cave* than to avoid it. Overbreath, or the presence of the "over-anxious lending officer," would be just as evident in *American Plating & Manufacturing Co.* and *In re Cooley* as it was found to be in *Mammoth Cave,* if *Mammoth Cave* is correct. As for the debtor's status as a going business, if such a distinction is sufficient of itself, then clearly *Mammoth Cave* would be inapplicable under the present circumstances as the present debtor, prior to bankruptcy, was also a going business, albeit one of an agricultural or farming nature. In short, the most straightforward justification for distinguishing *Mammoth Cave* advanced in either of the two opinions is that mentioned in *In re Cooley* in which the opinion concludes that,

> It would be contrary to the purpose of the UCC to hold that lawn tending equipment of this borrower was not sufficiently described by the language used in the security agreement.

*In re Cooley, supra* at 58.

That purpose, in the present context, as explained by *In re Drane,* is simply to place subsequent creditors on notice to make inquiry as to the extent of a prior secured creditor's interest in the debtor's property.

■ The collateral description scrutinized in *Mammoth Cave,* "All farm equipment...." appears to adequately fulfill that purpose, and is, in view of the language of the UCC, neither overly broad in its scope nor unacceptably vague in its designation of the property involved. None of the statutes presently discussed, KRS 355.9–110, –203(1)(b), –402(1), expressly proscribe taking a security interest in all of a debtor's property. *See United States v. First National Bank in Ogallala, Nebraska, supra* at 947. So long as both debtor and creditor agree to such terms, there appears to be no statutory bar in Chapter 355 to their executing an agreement to that effect. Nor would that same chapter appear to invalidate use of general terms such as "equipment" to adequately describe types or categories of collateral. To the contrary KRS 355.9–109(2) expressly validates the use of the term "equipment" as a class of goods. Therefore, *Mammoth Cave,* in its categorization of "All farm equipment" as an overly broad and vague description appears to run contrary to the purpose of the UCC and its provisions as enacted in our state. The continued vitality of the opinion would seem to exist only in those unique and limited circumstances wherein a debtor could prove that the creditor, in contravention of the parties' security agreement, sought to incorporate within its terms as collateral property not originally contemplated by the parties to be included. In all other circumstances, the reasoning of *In re Drane* would appear to be the more persuasive authority. Applying that test to the present circumstances forces us to conclude that Pioneer, upon proper investigation, could have reasonably identified the farm equipment in which the PCA had previously taken a security interest based upon the description of collateral involved. Whether this conclusion, however, will affect the outcome of the court below is

dependent upon the resolution of the next arguments raised by the parties.

## II.

### THE SUFFICIENCY OF THE EVIDENCE REGARDING THE SALE OF CATTLE FROM 1975 THROUGH 1980

In its second claim of error, PCA argues that Pioneer failed to carry its burden of proving that cattle sold by Vance during the 1975–1980 interim were those cattle, in effect, dairy cattle, in which Pioneer had secured an interest in its 1975 security agreement. Pointing to the testimony of certain bank officers of Pioneer, PCA reasons that the cattle bought and sold in the five year period were "trading cattle," primarily Holstein heifers, in which Pioneer admitted it had no security interest. Given Pioneer's failure to prove the disposition of the dairy herd, PCA concludes that the 1985 judgment awarding Pioneer $97,447 must be reversed as the findings in support of it are clearly erroneous.

In response, Pioneer replies that PCA's argument ignores the clear language of the after acquired property clause found in the March 9, 1975 agreement. Under that clause, Pioneer maintains that it possessed a security interest in *all* the cattle owned by Vance between March 9, 1975, and March 9, 1980, be they dairy or trading cattle. As Pioneer views the significance of events during this time, PCA, by its retention of the proceeds from the various cattle sales, converted the proceeds from the sale of Pioneer's collateral.

After an exhaustive review of the numerous judicial decisions cited to us, we conclude that Pioneer's arguments on this point are correct.

Before we begin our survey of that body of authority, however, we pause to specifically reject appellant's contention that the statements of appellee's officers are binding judicial admissions indicating that Pioneer sought only to take a security interest in the dairy cattle owned by the debtor.

■ A judicial admission is a formal act by a party in the course of a judicial proceeding which has the effect of waiving or dispensing with the necessity of producing evidence by the opponent and bars a party from disputing a proposition in question. *Center v. Stamper,* Ky., 318 S.W.2d 853, 855 (1958), (citing *Sutherland v. Davis,* 286 Ky. 743, 151 S.W.2d 1021, 1024 (1941)). *See also* Lawson's *Kentucky Evidence Law Handbook,* 127 (1976), (defining judicial admission). While statements made under oath in a pretrial deposition have been repeatedly held sufficient to constitute a judicial admission, *Fletcher v. Indianapolis and Southeastern Trailways, Inc.,* Ky., 386 S.W.2d 264 (1965), to be conclusive upon a party, such statements, in the light of all the conditions and circumstances proven, must additionally *not* give rise to the probability of error in the party's own testimony. *Moore v. Roberts by and through Roberts,* Ky., 684 S.W.2d 276, 277 (1985), (citing *Sutherland, supra* at 1024). If there exists no probability of error in the party's statements, then he will not be permitted to introduce or rely upon other testimony. *Id.*

■ Given these requirements, appellant's arguments with regard to Officers Ferren and Chaney and their statements upon deposition must fail. First, with regard to Chaney, appellee correctly points out that at the time of his deposition, he was no longer an officer of the bank and, thus, was not a party to the action, a necessary requirement for the creation of a judicial admission. Next, turning to Ferren's testimony, we note that it is internally inconsistent and cannot be said to be of such a nature as to remove all doubt as to the probability of error on this disputed issue. To the contrary, Ferren, by his third and final deposition, testifies that appellee bank, via its after acquired property clause, took an interest in all of the cattle owned by the insolvent debtor. This being the case, we conclude that the statements of the officers involved are not of such a nature to be deemed judicial admissions. The findings of the trial court as to existence and extent of appellee bank's after acquired interest in *all* cattle owned by the involved debtor are accordingly affirmed as being supported by substantial evidence in

the form of appellee's 1975 security agreement. As noted at the outset of this opinion, that particular agreement created an interest in "*All* livestock ... including but not limited to: 200 head holsteins, ages six months to nine years, 150 head mixed herefords ...," with the security to include "*all* proceeds or products therefrom, if any and all similar after acquired property." (our emphasis).

■ As for the issue of conversion arising from PCA's retention of proceeds from the sale of the "trading" cattle, there is no doubt but that Pioneer, via the language of its security agreement, possessed a continuously perfected security interest in all cattle owned by Vance and their sale proceeds. Under KRS 355.9–306(2) a security interest continues in collateral and its identifiable proceeds regardless of sale by the debtor unless such action was authorized by the secured creditor in the security agreement or otherwise. KRS 355.9–306(2). While a buyer in the ordinary course of business ordinarily takes free of a perfected security interest created by the seller, KRS 355.9–307(1), persons buying farm products from a person engaged in farming operations are specifically exempted. *Id.* Therefore, the monies received by PCA as a result of Vance's cattle sales are subject to Pioneer's continuing perfected security interest assuming Pioneer did not by its security agreement or otherwise authorize the sale of Vance's cattle. As we find no language in the 1975 security agreement expressly authorizing sale, and no conduct or representations by Pioneer sufficient to otherwise authorize sale, retention of the proceeds by PCA constituted wrongful conversion.

We are supported in this conclusion by *Ranier v. Gilford*, Ky.App., 688 S.W.2d 753 (1985), a recent decision of this Court specifically recognizing a secured creditor's right of action for wrongful conversion of collateral against the third party transferee of a secured party's debtor. In that situation, Gilford Company had loaned money to C & S Construction taking as collateral a security interest in certain equipment owned by C & S. Unknown to Gilford, C & S later sold this collateral to Ranier & Associates without authorization, thereby defaulting on its security agreement with Gilford. C & S soon thereafter took bankruptcy. Gilford, informed of the sale to Ranier through the bankruptcy proceedings, contacted Ranier informing it of Gilford's lien on the equipment. Five months later, Ranier, via a bankrupt associated company, sold the equipment at a dispersal sale. As a result, Gilford successfully sued Ranier for conversion, receiving a $45,424 judgment plus interest.

On appeal, this Court affirmed the judgment citing KRS 355.9–306(2) and the official comment to the 1972 Uniform Commercial Code, 3 ULA–UCC p. 441–42 (1981). In support of its conclusion, the court reasoned that this was an "appropriate case" for the secured party to maintain a conversion action as both original debtor and its transferee were bankrupt and the collateral was no longer in either's possession. *Id.* at 755.

We believe that this appeal presents an equally "appropriate case" for recovery via an action in conversion. Vance, like C & S Construction, is bankrupt. Likewise, neither Vance nor Nolin PCA has possession of the collateral. The sole source of recovery for Pioneer is to be found in its perfected security interest in the sale proceeds in the hands of Nolin PCA.

While Kentucky's appellate courts have yet to have addressed the issue of conversion under the UCC in the context of cattle sales, several decisions of other major beef producing states have written on the issue and do support this Court's conclusions. *See First National Bank of Joliet v. Conness*, 33 Ill.App. 765, 338 N.E.2d 459 (1975); *Baker Production Credit Assoc. v. Long Creek Meat Company, Inc.* 266 Or. 643, 513 P.2d 1129 (1973); *First National Bank and Trust Company of Oklahoma City v. Iowa Beef Processors, Inc.*, 626 F.2d 764 (10th Cir.1980). For judicial decisions dealing with UCC § 9–306(2) in other factual contexts, *see Consolidated Equipment Sales Inc. v. First State Bank & Trust Company of Guthrie*, 627 P.2d 432 (Okla. 1981); *United States v. Minister Farmers*

*Cooperative Exchange, Inc.*, 430 F.Supp. 566 (N.D.Ohio W.D.1977); *Farmers State Bank, Aurora v. Edison Non-Stock Cooperative Ass'n.*, 190 Neb. 789, 212 N.W.2d 625 (1973). In light of *Ranier* and the above-listed decisions, we conclude that retention of the cattle sale proceeds by Nolin PCA constituted a conversion of those proceeds to the extent of the indebtedness owed Pioneer by Vance arising from the 1975 security agreement.

### III.

### EQUITABLE ESTOPPEL

Appellant, by its third argument, maintains that even if Pioneer had properly been determined by the circuit court to have a continuing perfected security interest in all of the debtor's cattle, and their proceeds, the trial court erred in refusing to find Pioneer equitably estopped to assert that interest. In this regard, Nolin PCA argues that the trial court's reliance upon *Burlington Nat'l. Bank v. Strauss*, 50 Wis.2d 270, 184 N.W.2d 122 (1971), is misplaced as that decision relates solely to a waiver, a knowing relinquishment of one's rights, *Jones v. Rayborn*, Ky., 346 S.W.2d 743 (1961), and not to equitable estoppel, a judicial refusal to enforce the rights of one who has previously chosen not to assert them to the detriment of an innocent third party. *Pope v. Kirk*, Ky., 255 S.W.2d 468 (1953). In Nolin's view, Pioneer should not have been permitted to assert its lien in the cattle after Vance's bankruptcy when prior to that time, Pioneer had taken no action to protect its interest. Instead, Nolin points out that Pioneer knew that Nolin was financing Vance's cattle operation, and that Chaney, at a time when he was an officer of Pioneer, recommended that Vance finance his operation through Nolin, himself sold cattle to Vance, and received payment from PCA. These facts are reasoned to be similar in effect to *Wilson v. Scott*, 12 Ky. Law Rep. 693, 15 S.W. 130 (1891), *Frankfort and C.R.Y. Co. v. State National Bank of Frankfort*, 31 Ky. Law Rep. 323, 102 S.W. 243 (1907), and *First Federal Savings & Loan Assoc. v. Cundiff*, Ky. App., 704 S.W.2d 664 (1986), in which certain parties who failed to timely assert their claims to various properties were held to be estopped from later pressing those claims due to the reliance of innocent third parties on the inactivity of the claimants.

The problem with this line of attack is that it ignores that Pioneer did act to assert its interest through the language of its properly filed financing statement and security agreement. No other action needed to be taken as the statement and agreement put appellant on notice of appellee's lien interest. Pioneer had no further duty to emphasize to Nolin PCA that it would act to enforce its interest should Vance default. Had Pioneer, by its officers, given assurance to Nolin PCA that it would *not* act to enforce its superior interest upon default, then perhaps appellant would have a stronger argument. However, Pioneer's interest was recorded for all to see.

Moreover, as Pioneer points out, had Nolin PCA chosen to, it could have filed a specific purchase money interest in the cattle it financed, KRS 355.9–312(4), or approached Pioneer about relinquishing its interest. Thus, it can strongly be argued that Nolin PCA's own inactivity, and not that of Pioneer, resulted in its loss. Accordingly, Nolin PCA cannot with good conscience raise an equitable argument based on its own failure to fully protect its interest.

General principles of equity aside, Nolin's argument runs contrary to the underlying philosophy of the Uniform Commercial Code. As explained in *Burlington Nat'l. Bank v. Strauss, supra* at 124,

Prior to the code, it was almost impossible for a lender to maintain in farm financing a valid security on a herd of cattle which was being sold or renewed. In order to give more flexibility to such financing, the code freed the debtor from strict accountability to the secured creditor for the property secured, and recognized the validity of a secured interest in after acquired property. Thus a debtor is now able to commingle his property and use to his best interest, and the acquiescence of the secured creditor under an after acquired clause in such a

program by the debtor does not invalidate the security interest of the creditor. (citations to the Wisconsin codification of the UCC deleted). We conclude, in a similar vein, that Pioneer's knowledge of Vance's financing arrangements with Nolin PCA, and the sale of cattle to Vance by one of Pioneer's officers, constituted nothing more than mere acquiescence insufficient to constitute an equitable estoppel.

## IV.

### PROOF OF DAMAGES

 Nolin PCA next argues that Pioneer failed to adequately prove its damages and that the trial court used the wrong measure of damages. Recovery for conversion, Nolin points out, is determined by proof of the fair market value of the property converted at the time of conversion. *Amlung v. Bankers Bond Co.*, Ky., 411 S.W.2d 689 (1967). Rather than make such a finding, the trial court is argued merely to have determined that PCA should pay Vance's indebtedness to Pioneer. We disagree with both of these contentions. The trial court specifically found and the record confirms that Vance received some $268,-913.09 as a result of his cattle sales during the interim in question. This proof is more than adequate to establish the fair market value of the collateral converted at the time of conversion. As Pioneer points out, moreover, it is in actuality the proceeds which have been converted in this case. The cattle involved have long been sold to unknown transferees and are not capable of recovery. Thus, the proceeds, $268,-913.09, to the extent of the indebtedness secured, are the subject of the conversion. KRS 355.9–306(2). These proceeds have been sufficiently proven and adequate findings made as to their extent.

With regard to the indebtedness owed Pioneer by Vance, the findings of fact, conclusions of law and judgment of July 25, 1985, clearly set out the amounts owed on the July 22, 1970 note, $6,849.90, and the March 27, 1980 renewal note, $90,-597.11. As before, we fail to see any deficiency in either of these findings given the substantial evidence supporting them.

## V.

### INTEREST

 By its final argument, Nolin maintains that the trial court misinterpreted KRS 360.040 to improperly impose interest against it at the contract rate established between Vance and Pioneer rather than the proper statutory rate of 12%. In its July 25, 1985 judgment, the trial court imposed prejudgment interest of 7% on the July 22, 1970 note and interest of 16% on the March 27, 1980 renewal note. According to Nolin, this result is in error as the judgment involved arises from conversion, not a judgment on a written obligation. Thus, Nolin PCA should not have been ordered to pay the same interest rate which Vance was paying to Pioneer. According to KRS 360.-040,

360.040. Interest on judgment.—A judgment shall bear twelve percent (12%) interest compounded annually from its date. *A judgment may be for the principal and accrued interest; but if rendered for accruing interest on a written obligation, it shall bear interest in accordance with the instrument reporting such accruals, whether higher or lower than twelve percent (12%).* Provided, then when a claim for unliquidated damages is reduced to judgment, such judgment may bear less interest than twelve (12%) if the court rendering such judgment, after a hearing on that question, is satisfied that the rate of interest should be less than twelve percent (12%). All interested parties must have due notice of said hearing.

(our emphasis). Looking to the italicized language of the statute, we conclude that no error occurred in imposing prejudgment interest against Nolin PCA at the rates set out in the two notes executed by Vance and Pioneer. While it is true that the judgment rests upon conversion, it is conversion of that portion of sale proceeds representing Pioneer's security interest in the collateral. That security interest is specifically determined, or limited, by the contractually established principal and accrued interest set

out in the written obligations. Thus, the judgment is for that amount of converted proceeds representing principal and interest arising from the two notes or "written obligations" involved. The basis of appellee's recovery under the judgment does, therefore, rest upon the written obligation involved. The trial court's interpretation of KRS 360.040 accordingly was correct.

The judgment of the Hart Circuit Court is affirmed. While this Court does conclude that the trial court erred in its determination that the collateral descriptions found in the 1976 and 1977 financing statements by Nolin PCA were inadequate, this error is beyond doubt harmless. Any amounts not recovered by Pioneer through execution of the October 2, 1983 judgment regarding the farm equipment would be properly recoverable via the appellee's conversion theory. Thus, it is immaterial whether the $10,778 involved is recovered from the sale proceeds of the farm equipment or the wrongfully converted sale proceeds of the cattle. The amount of recovery is identical.

The judgment is affirmed.

All concur.