No. 61,046

FARMERS STATE BANK, *Appellee,* v. PRODUCTION CREDIT ASSOCIATION OF ST. CLOUD, *Appellant.*

(755 P.2d 518)

Opinion filed April 29, 1988.

R. *Kent Pringle,* of Coombs, Pringle & Horn, of Chanute, argued the cause and was on the brief for appellant.

*Jesse T. Randall,* of Mound City, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

HERD, J.: Production Credit Association (PCA) of St. Cloud, Minnesota, appeals the district court's orders in a case involving the recovery of proceeds from the sale of cattle pledged as security to Farmers State Bank (Farmers) of Blue Mound, Kansas, for loans made to rancher Virgil Girtz.

Virgil Girtz conducted a commercial and purebred South Devon cattle operation in Minnesota. The operation was financed by PCA, which held a security interest in the cattle. Most of Girtz's contacts with PCA were through loan officer Don Muller.

In 1983, without notifying PCA, Girtz bought land in Kansas and moved his cattle there. Girtz testified his operation was going well in Minnesota, but he moved to Kansas because its central location and superior markets would enable him to expand his purebred operation.

Girtz subsequently located some purebred heifers in South Dakota which he could purchase for a good price at a forced sale. He obtained financing from Dale Sprague, sole owner of Farmers State Bank. He gave Sprague a financial statement which showed he currently had cattle which were secured by PCA. He obtained a loan of $30,000 toward the purchase of 45 head of two-year-old springer heifers and moved them to Kansas. Farmers did not loan Girtz the full cost of the cattle since it did not loan more than commercial value on livestock.

Girtz sold some of the PCA financed cattle to cover the difference in the purchase price. He applied part of the remainder of the proceeds from the sales to the PCA loan and used the balance for operating expenses. Girtz gave Farmers a financing statement, a promissory note, and a security agreement dated March 28, 1983, on the 45 heifers and after-acquired livestock.

Girtz initially testified he notified PCA he had moved his operation to Kansas at about this time. He said he told Muller he was running a purebred herd with Farmers' money. Girtz later

testified he did not remember how PCA found out he had moved the cattle to Kansas. Muller testified he tracked Girtz down in Kansas after hearing rumors of his move. Muller testified that at some point during the phone calls he made to Kansas trying to "follow the outline of [Girtz's] whole operation," he learned Farmers had loaned Girtz some money to buy cattle. He said Girtz told him of the loan with Farmers when Girtz tried unsuccessfully to obtain a loan from PCA for the operation in Kansas.

PCA filed a financing statement on its collateral in Woodson County, Kansas. It was thus put on notice of Farmers' security interest and had the opportunity to identify those cattle secured by Farmers. See *Nolin Prod. Credit v. Canmer Deposit Bank,* 726 S.W.2d 693, 697 (Ky. App. 1986).

Girtz later obtained another loan from Farmers for the purchase of 51 head of South Devon open heifers in Minnesota. He executed another note and security agreement, dated June 20, 1983, for the additional loan, which specifically covered the open heifers. Farmers filed all financing statements and security agreements in both Allen and Woodson Counties, Kansas, where the cattle were located at different times.

Girtz commingled the cattle secured by Farmers and PCA. However, the 96 head of cattle which were security for Farmers' loans were identified by ear tags and tattoos.

Sprague inspected Girtz's cattle four times; the last time was in February of 1984. All of the secured cattle were present, as well as an increase of 20 heifers and 10 bull calves from the springer heifers. Cull calves had been sold to pay operating expenses and interest on the loans from Farmers, a practice authorized by Mr. Sprague. Other operational costs were funded by continued financing from PCA. Sprague believed Girtz's operation was going well.

Unknown to Sprague, however, Girtz was running into financial difficulties. He was unable to sell his ranch in Minnesota, and his other businesses were suffering because of the agricultural depression. He testified a lot of calves died in the winter of 1984. He was in debt to operating creditors, such as feed suppliers. He did not inform Sprague of his difficulties, but in April, during one of his trips to Minnesota to check on the prospects for the sale of his business there, he talked to Muller at PCA.

Muller told him he should set up a marketing program in order to liquidate because he now showed a "negative net worth." Muller recommended but did not demand that Girtz liquidate.

When he returned to Kansas, Girtz, without informing either Farmers or PCA, contacted Larry Nielson, a person he met through the South Devon Association who could put together a marketing plan for him. Because Nielson was operating out of Missouri, he suggested Girtz move his cattle to his land in Missouri in preparation for sales there. Girtz moved about two-thirds of the cattle to Missouri sometime in April of 1984, again without informing Farmers or PCA. At least part of the cattle taken to Missouri were secured by Farmers. The evidence was inconclusive as to how many of the cattle remaining in Kansas were secured by Farmers.

After Girtz moved the cattle to Missouri, Muller learned what was going on and filed a financing statement there. He asked Nielson to send PCA a copy of the inventory of the cattle he was going to sell for Girtz. Nielson failed to comply. Concerned, Muller made a trip to Missouri to check the cattle on May 14. Muller testified all the cattle he was shown were PCA cattle. He found some PCA cattle unaccounted for. Muller said he was aware some cattle remained in Kansas, and was aware Farmers had an interest in some of the Girtz cattle, but did not know which cattle or their location. He testified he called the local PCA office in Missouri and told it to contact Farmers over the matter. Muller and Girtz then went to Kansas and Muller inspected the cattle there. It was his understanding all the cattle he inspected in Kansas were PCA cattle.

Nielson first arranged for the sale of eleven of Farmers' cattle at private treaty and then arranged for the sale of nine of Farmers' cattle at a show in Tulsa. Although Girtz sometimes testified PCA eventually received some or even all of the proceeds from these sales, he at other times testified the money was used for feed and rent to Nielson. No proceeds went to Farmers.

Muller was not told the Nielson sales were of Farmers' cattle, and he was disappointed with the weights of the cattle and the prices they received. It was arranged that Nielson was to send a check on the profits to PCA, but the check was late in arriving. When it was deposited, it was returned for insufficient funds.

Muller made another trip to Missouri. He found the cattle very thin and in poor condition. Their condition had deteriorated dramatically since he first saw them. Nielson had his pasture overstocked and was providing no supplemental feed.

Neither Muller nor Girtz believed the cattle could remain in Nielson's hands. Fifty-four head of cattle, including some secured by Farmers, were moved to Lamar, Missouri, and later sold. Muller and Girtz decided to move the rest of the cattle back to Minnesota to Girtz's ranch. Girtz explained PCA did not force him to move the cattle to Minnesota; rather, it cooperated with his plans to sell the cattle. Girtz did not move the cattle back to Kansas because his remaining Kansas property did not contain enough pasture for all the cattle. Farmers was not notified of the move to Minnesota.

PCA advanced the money to Girtz for transportation to Minnesota and for feed to prepare the cattle for sale. Girtz testified he advised PCA that Farmers had an interest in some of the cattle and PCA indicated its main concern at the time was that the "cattle were in distress" and everything else could be argued about later.

The cattle, including those that had been left in Kansas, were transported to Minnesota in July of 1984. PCA was unwilling to loan Girtz enough additional money to keep the cattle through another winter, and Girtz did not have the money to do it, so it was decided to sell the cattle at a sale in Minnesota after they had gained some weight. PCA advanced the additional money to feed and prepare the cattle for sale.

In August, Sprague, unaware of what had transpired, went to see why Girtz had ignored a past due note notice. He found Girtz and the cattle gone. A neighbor of Girtz's suggested he might have moved back to Minnesota. This was Sprague's first knowledge of Girtz's movement of the cattle from Kansas.

While Sprague was trying to ascertain where Girtz and the secured cattle were, he was contacted by an attorney representing the Missouri PCA office. The attorney said he wanted to know about the cattle Farmers had as security and asked to see the security instruments. Sprague directed him to Farmers' attorney. In September, Sprague learned Girtz was in Minnesota and filed a financing statement there on the cattle Farmers held

as security for its loans. Farmers did not file a financing statement in Missouri as it was unaware the cattle had been removed to Missouri until after they had been sold or removed to Minnesota.

The cattle were sold at auctions in Minnesota from November 1984 to January of 1985. All of the cattle, including PCA secured and Farmers secured, were sold by January. Neither PCA nor Girtz informed Farmers about the sales. Sale checks in Minnesota were made out to Girtz. He voluntarily endorsed them over to PCA. Girtz said he never suggested any of the proceeds belonged to Farmers because of his assumption PCA "had first secured interest." Muller said PCA could not have stopped Girtz from signing some of the checks over to Farmers had Girtz chosen to do so.

The evidence shows the following disposition of the 96 head of cattle in which Farmers had a security interest. The sale prices in some instances are approximations given by both parties, as the sale records are unclear or nonexistent.

<u>45 head:</u>

| | |
|---|---|
| 28 head | were sold at auction in Minnesota for $350 each; |
| 9 head | left in Missouri when the rest were moved to Minnesota; sold for $350 each; |
| 4 head | sold in Oklahoma for $1,142 each; |
| 2 head | sold in Missouri at private treaty for $1,000 each; |
| 1 head | died in Kansas; |
| 1 head | sold for unknown amount with Girtz turning the proceeds over to a former partner. |

<u>51 head:</u>

| | |
|---|---|
| 18 head | sold at Minnesota auction for $350 each; |
| 14 head | left in Missouri; sold for $350 each; |
| 9 head | sold in Missouri for $1,000 each; |
| 5 head | sold at Tulsa livestock show for $1,142 each; |

<u>5 head</u>        died in Kansas.

Total     96 .head

          selling price $45,428

Some of the listed cattle were with calf. Other than the cull calves reported sold for interest payments and operating expenses, there is no evidence of disposition of offspring.

Sprague estimated the commercial value of the 45 head to be between $400 to $500 per head, and the 51 head at around $500 per head. With proper care and marketing under a purebred program, Sprague testified the 96 head would have been worth $1,000-$1,200 per head. The thirty calves he had seen in Kansas would have been worth about $600-$700 per heifer and around $800-$1,000 per bull. Sprague considered the method of sale commercially unacceptable.

Sprague based his opinions on his experience on his own farm on which he kept repossessed cattle. He testified it would have taken about $150 for six months of care to get a brood cow in condition to be sold as purebred stock. He testified had he repossessed the cattle in poor condition, he would have invested such additional time and funds to make the cattle fit for the purebred market.

Farmers filed an action in Linn County on June 19, 1985, against PCA for $71,403.97, plus interest, representing the portions of notes given it by Girtz which remained unpaid. According to the pretrial conference order, Farmers claimed PCA wrongfully directed Girtz to sell livestock which was properly secured by Farmers and that PCA received the proceeds from the sale which was properly secured by Farmers.

In a memorandum decision filed March 27, 1987, the district court made the following findings of fact in granting judgment to Farmers in the amount of $33,677.60, plus interest at the statutory rate from the date of judgment:

"This Court was concerned about the lack of filing of a financing statement in the State of Missouri by plaintiff Bank, and, also, the delay in filing in the State of Minnesota. The Court is aware that the Uniform Commercial Code provides for filing within four months from the date the property leaves the jurisdiction. In this particular case, two things strike the Court as important. First, that the plaintiff Bank was not aware for some time that the property had been removed. By the time the removal was learned of, a second removal had occurred, and the

Bank had done about all it could do. And the other important factor, which the Court believes is important in this case, was the testimony of Don Muller, who was loan officer of Production Credit Association of St. Cloud, and handled the Virgil Girtz account. Muller testified that he had knowledge that Farmers State Bank had a security interest in 96 head of purebred South Devon cows and their offspring. He further testified, in answering a question, that although he had knowledge that Farmers State Bank had a security interest in the cattle, he was not concerned about that interest. The Uniform Commercial Code was adopted in order to expedite commercial proceedings, and was primarily designed to protect innocent purchasers of property which may be secured, and places the burden upon the holder of the security interest to see that the public is properly made aware of its security interest. It is the opinion of this Court, however, that in this case, Production Credit of St. Cloud cannot be said to be an innocent purchaser."

Farmers moved for a new trial or an amended judgment; PCA for an amended judgment. PCA's motion was denied on May 21, 1987; Farmers' was also denied except for awarding interest from January 1, 1985. PCA appeals.

The first issue is whether Kansas had jurisdiction of this cause. PCA argues Kansas does not have subject matter jurisdiction because the issues concerning the perfection of security interests are governed by laws of other states.

One of the first duties of a court is to determine whether it has subject matter jurisdiction of the case. This is true regardless of whether the issue is raised by the parties. *City of Overland Park v. Barron*, 234 Kan. 522, 672 P.2d 1100 (1983); *Harshberger v. Board of County Commissioners*, 201 Kan. 592, 442 P.2d 5 (1968). The parties agreed at pretrial conference as follows:

"(3) Venue and Jurisdiction—The parties acknowledge that the Court has jurisdiction over the parties and the subject matter of this lawsuit, reserving, however, those issues raised under Questions of Law . . . .

. . . .
"(8) Questions of Law . . . .

. . . .
"(f) Does the law of Kansas apply to sale[s] made in Missouri and Minnesota[?]"

Subject matter jurisdiction, however, is vested by statute and cannot be established by waiver or estoppel. *Micheaux v. Amalgamated Meatcutters & Butcher Workmen*, 231 Kan. 791, 648 P.2d 722 (1982).

The case at bar concerns the proceeds of cattle secured in

Kansas. The transaction in controversy bears a reasonable relation to the State of Kansas. We therefore hold the district court of Linn County had jurisdiction of this action.

The second issue is whether Kansas law applies to sales made in Missouri and Minnesota. PCA claims there is an issue of nonperfection in this case. K.S.A. 1987 Supp. 84-9-103 guides choice of law as to the effect of perfection or nonperfection of secured goods which have been moved from state to state. Collateral in goods such as cattle, subject to exceptions not relevant herein, are controlled by the law of the jurisdiction where the collateral was when the *last event* occurred on which is based the claim that the interest is perfected or unperfected. K.S.A. 1987 Supp. 84-9-103(1)(b).

The official U.C.C. Comment notes the "event" to which K.S.A. 1987 Supp. 84-9-103(1)(b) refers will often be the filing of, or the failure to file, a financing statement. The Comment explains that, subject to exceptions not relevant to the case at bar, when a security interest is perfected in one state but then moved to another, the filing of a financing statement in the latter state, or the failure to do so, is the "last event" to which the statute refers. K.S.A. 84-9-103, Official U.C.C. Comment 1; 9 Vernon's Kansas U.C.C. § 84-9-103, Uniform Code Comment, p. 59 (1988 Supp.).

It is thus clear that the laws of Missouri and Minnesota, rather than Kansas, apply as to the effect of Farmers' perfection or nonperfection in those states. However, PCA errs in deeming this to be an issue. There is no question Farmers' interest was properly perfected in Kansas as to its listed 96 head of cattle. See K.S.A. 1987 Supp. 84-9-203; K.S.A. 1987 Supp. 84-9-302(1). Farmers' financing statement contained an "after-acquired" clause, but there is no evidence PCA's did. Rather, the testimony indicates PCA's interest was perfected in Minnesota as to certain listed cattle. Muller testified PCA was not interested in claiming cattle secured by Farmers. There is no evidence PCA's financing statements filed in Kansas or Missouri enlarged its security interest. The appellant carries the burden of designating a record sufficient to present its points to this court. *State ex rel. Ludwick v. Bryant,* 237 Kan. 47, 697 P.2d 858 (1985). Thus, PCA had no security interest in any cattle to which Farmers held a security interest.

Farmers' claim is based on its perfected security interest in Kansas. Thus, Kansas law properly applies. K.S.A. 84-1-105 provides:

"[W]hen a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties. Failing such agreement this act applies to transactions bearing an appropriate relation to this state."

See K.S.A. 84-9-102; *Mammoth Cave Prod. Credit Ass'n v. Oldham,* 569 S.W.2d 833, 838 (Tenn. App. 1977). We hold that the transaction involved in this case, which was the unauthorized removal and sale of secured collateral from this state, bears an appropriate relation to this state, and the law of Kansas applies. We also note the issue is relatively insignificant because both Missouri and Minnesota have adopted Article 9 of the Uniform Commercial Code. See Mo. Rev. Stat. § 400.9-101 *et seq.* (1986); Minn. Stat. § 336.9-101 *et seq.* (1986).

The third issue raised by PCA is whether Farmers' security interest lapsed as to PCA due to its failure to file a financing statement in Missouri and its delay in filing in Minnesota. The record clearly shows Farmers' security interest was perfected in Kansas. Some of Farmers' cattle were then moved to Missouri and sold there. PCA filed a financing statement in Missouri on those cattle in which it had a security interest within four months of the move. Farmers, not learning of the move to Missouri until much later, did not file a financing statement on its security in Missouri. We must first determine whether Farmers had a valid security interest as against PCA's receipt of the proceeds in those cattle sold in Missouri upon which PCA held no security interest.

Perfection of security interests in multiple state transactions is governed by K.S.A. 1987 Supp. 84-9-103, which reads in relevant part:

"(1)(a) This subsection applies to documents and instruments and to goods other than those covered by a certificate of title described in subsection (2), mobile goods described in subsection (3), and minerals described in subsection (5).

"(b) Except as otherwise provided in this subsection, perfection and the effect of perfection or nonperfection of a security interest in collateral are governed by the law of the jurisdiction where the collateral is when the last event occurs on which is based the assertion that the security interest is perfected or unperfected.

. . . .

"(d) When collateral is brought into and kept in this state while subject to a security interest perfected under the law of the jurisdiction from which the collateral was removed, the security interest remains perfected, but if action is required by part 3 of this article to perfect the security interest, (i) if the action is not taken before the expiration of the period of perfection in the other jurisdiction or the end of four months after the collateral is brought into this state, whichever period first expires, the security interest becomes unperfected at the end of that period and is thereafter deemed to have been unperfected as against a person who became a purchaser after removal; (ii) if the action is taken before the expiration of the period specified in subparagraph (i), the security interest continues perfected thereafter."

Cattle are covered by subsection one, as they are not mobile goods as described in subsection three. A financing statement must be filed to perfect an interest in cattle, K.S.A. 1987 Supp. 84-9-302, and therefore subsection (1)(d) applies.

"This state" refers to the jurisdiction to which the cattle were moved. See 9 Vernon's Kansas U.C.C. § 84-9-103, Kansas Code Comment, p. 58 (1988 Supp.). Farmers thus was required to file in Missouri within four months after the cattle were removed to Missouri. It makes no difference whether the cattle were sold in Missouri within four months of leaving Kansas because Farmers did not file in Missouri within the four-month period; therefore, Farmers' security interest became unperfected "and is thereafter deemed to have been unperfected as against a person who became a purchaser after removal." K.S.A. 1987 Supp. 84-9-103(d)(i). See *Victory Nat'l Bank of Nowata v. Stewart*, 6 Kan. App. 2d 847, 636 P.2d 788 (1981).

PCA, however, an unsecured party as to Farmers' security interest, does not qualify as a "purchaser" under K.S.A. 1987 Supp. 84-9-103(1)(d)(i). See K.S.A. 1987 Supp. 84-1-201 (32) and (33). Nor does PCA qualify as one entitled to priority over an unperfected security interest pursuant to K.S.A. 1987 Supp. 84-9-301. PCA was not a buyer in the ordinary course of business. K.S.A. 84-9-307; K.S.A. 1987 Supp. 84-1-201(9); *In re Mid-Atlantic Piping Products of Charlotte*, 24 Bankr. 314 (Bankr. W.D.N.C. 1982). Even were PCA to be deemed a buyer in the ordinary course of business, its knowledge of Farmers' security interest in farm products precluded it from priority. K.S.A. 1987 Supp. 84-9-301(1)(c); K.S.A. 84-9-307.

A security agreement is effective between parties and against purchasers of the collateral and creditors. K.S.A. 84-9-201. The security interest continues in the collateral's proceeds after it is sold unless the disposition was authorized by the secured party. K.S.A. 84-9-306. Thus, in the absence of such authorization, the transferee of proceeds takes subject to the security interest of the secured party. See Official U.C.C. Comment 3 to K.S.A. 84-9-306; *Smith v. Guzman*, 16 U.C.C. Rep. Serv. (Callaghan) 852, 855 (N.Y. 1975).

One of the issues in *Nolin Prod. Credit v. Canmer Deposit Bank*, 726 S.W.2d 693 (Ky. App. 1986), concerned a transaction quite similar to the case at bar. PCA received proceeds from the unauthorized sale of collateral secured by another creditor. The appellate court held the retention of the proceeds by PCA constituted wrongful conversion and found the trial court was correct in awarding the proceeds to the creditor. The appellate court noted that, as neither the debtor nor PCA retained possession of the collateral, the only realistic source of recovery by the creditor would be through recovery of the proceeds gained by PCA.

Under the *Nolin* rationale, Farmers' unperfected security interest in the cattle in Missouri has priority over an entity not a purchaser with no security interest in the cattle. Thus, Farmers is entitled to the proceeds from the sale, less cost of care, of Girtz's cattle in Missouri upon which it held an unperfected security interest.

We rely on the same reasoning to hold Farmers is entitled to the proceeds of those cattle moved to Missouri and then to Minnesota. Although Farmers' security interest in those cattle was unperfected, Farmers retained priority over PCA, which was neither a purchaser nor holder of a security interest therein. Farmers' filing in Minnesota was timely made as to those cattle moved directly from Kansas to Minnesota, and, therefore, there is no question of its priority as to them. Hence, Farmers State Bank is entitled to the proceeds of the sale of cattle upon which it held a security interest, less expenses incurred by PCA for costs of care.

The next issue is whether the evidence was sufficient to support the district court's finding that PCA received proceeds

from cattle sold by Girtz at private treaty in Tulsa and Missouri.

When a finding of a district court is attacked for insufficiency of the evidence, we as an appellate court must search the record for any substantial competent evidence which, viewed in the light most favorable to the party prevailing below, supports the finding of the district court. *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, 681 P.2d 1038, *cert. denied* 469 U.S. 965 (1984).

Girtz testified the proceeds of the sales in Minnesota went to PCA, and the evidence clearly bears this out. As to the cattle sold in Missouri, he testified the proceeds of the 23 head sold at commercial prices went to PCA. PCA agrees it received those proceeds remaining after expenses. Girtz was not sure where the proceeds ended up from the sale at private treaty in Missouri. Sometimes he testified PCA received the proceeds; at other times he said "a big chunk" went to Nielson. At the hearing on motions after trial, the court stated the testimony on where the proceeds on the Missouri cattle went was "pretty indefinite."

Girtz wasn't sure whether the proceeds from the sales in Oklahoma went to PCA or for feed and pasture. Sometimes he said some of it went to Nielson. Muller testified he understood the proceeds from the Oklahoma sales went for feed.

Farmers contends Girtz testified if any of the proceeds were used to pay feed bills, it was at the direction of PCA. We can find no support for this statement in the record. PCA argues Farmers cannot claim proceeds from PCA which PCA did not receive, but which were instead used to keep the cattle alive. The one certainty is that Farmers received nothing from sales of its security, nor was it notified or consulted about the disposition thereof. We hold there was sufficient substantial competent evidence to support the findings of fact of the trial court that PCA received proceeds from cattle sold by Girtz at private treaty.

It follows that the next issue is whether the district court erred in awarding Farmers recovery for proceeds from sales of Farmers' security which were made with the knowledge and under the supervision of PCA where the evidence that PCA received the proceeds is very sketchy. Recovery by Farmers is limited to identifiable cash proceeds of the sale of cattle. K.S.A. 1987 Supp. 84-9-203(3); K.S.A. 84-9-306(3)(b). The court noted "[t]he testi-

mony is somewhat vague as to how many cattle were involved," but found evidence of the sale of at least 434 head, of which 90 were secured to Farmers. The court then prorated the expenses at $130.56 per head and allowed PCA to deduct $11,750.40 from the proceeds from all cattle sold in Missouri, Oklahoma, and Minnesota, a total, based on Girtz's estimates, of $45,428.00. The court therefore awarded Farmers a total of $33,677.60.

Farmers' rights upon Girtz's disposition of its collateral are governed by K.S.A. 84-9-306:

"(1) 'Proceeds' includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds. . . . Money, checks, deposit accounts, and the like are 'cash proceeds.' All other proceeds are 'non-cash proceeds.'

"(2) Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

"(3) The security interest in proceeds is a continuously perfected security interest if the original collateral was perfected but it ceases to be a perfected security interest and becomes unperfected ten (10) days after receipt of the proceeds by the debtor unless

"(a) a filed financing statement covers the original collateral and the proceeds are collateral in which a security interest may be perfected by filing in the office or offices where the financing statement has been filed and, if the proceeds are acquired with cash proceeds, the description of collateral in the financing statement indicates the types of property constituting the proceeds; or

"(b) a filed financing statement covers the original collateral and the proceeds are identifiable cash proceeds."

It is undisputed Farmers did not authorize the disposition of the cattle. PCA argues the only identifiable cash proceeds it received were from the sale of the 46 head in Minnesota in the total amount of $16,100. It thus argues Farmers should be limited to a recovery of $10,094.24 after expenses are deducted.

Although PCA did not direct Girtz to move the cattle to Missouri, it had knowledge of the sales there. Muller came to Missouri to protect PCA's interest in these sales. Muller also had knowledge that Farmers had a security interest in some of the cattle. Muller testified, however, that he was not concerned with this knowledge.

The Code does not define "identifiable proceeds" or specify

what requirements a secured party must meet in order to identify proceeds. Thus, under K.S.A. 84-1-103, the principles of law and equity may be used to supplement the Code. See *Maxl Sales Co. v. Critiques, Inc.,* 796 F.2d 1293 (10th Cir. 1986); *Matter of Turner,* 13 Bankr. 15 (Bankr. D. Neb. 1981).

In *Ex parte Alabama Mobile Homes, Inc.,* 468 So. 2d 156 (Ala. 1985), the court found it proper to put the burden of proof on the debtor, rather than the creditor, to show why proceeds should not be garnished from the debtor's attorney when the debtor wrongfully transferred the proceeds from the sale of collateral to its attorney and the attorney knew of the creditor's rights in the proceeds.

Although the secured party usually has the burden of tracing proceeds of collateral, such a requirement may be waived when the collateral was fraudulently converted and the unsecured creditor had knowledge both of the disposition of the collateral and the secured party's interest in it. See *Matter of Great American Veal, Inc.,* 59 Bankr. 27 (Bankr. D.N.J. 1985). It would otherwise be in PCA's interest to ensure that records tracing proceeds were obscure or nonexistent.

We hold that the obligation of good faith and fair dealing in the course of commercial transactions and the prohibition against unjust enrichment require that a creditor who has knowledge of another's security interest bears the burden of proving it did not receive proceeds from sales in which it involved itself knowing the secured party was unaware of the sales. Although the secured party generally bears the burden of identifying the proceeds, in this case Farmers had no control over the records of the sale. PCA clearly had knowledge of and exerted some control over the sales and therefore had the responsibility to see that proper records were maintained in order to show it did not receive proceeds rightfully belonging to Farmers. PCA could have avoided this responsibility by means of a single telephone call to Farmers, informing it of the location of the cattle and the planned sales. It chose not to do so. See generally Schechter, *The Principal Principal: Controlling Creditors Should be Held Liable for Their Debtor's Obligations,* 19 U.C. Davis L. Rev. 875 (1986); Eisenberg, *Good Faith Under the Uniform Commercial Code— A New Look at an Old Problem,* 54 Marquette L. Rev. 1 (1971);

Oesterle, *Deficiencies of the Restitutionary Right to Trace Misappropriated Property in Equity and in UCC § 9-306*, 68 Cornell L. Rev. 172 (1983).

In *Tuloka Affiliates, Inc. v. Security State Bank*, 229 Kan. 544, 550, 627 P.2d 816 (1981), we held a situation in which a debtor was "robbing Peter to pay Paul" did "not create an absolute liability in Paul to repay Peter." It was important to our decision in that case, however, that Paul had no way of knowing the money he received was taken from Peter's pocket.

We hold Farmers is entitled to recover from PCA the proceeds from cattle which were sold with PCA's knowledge. We therefore affirm the trial court's award of $45,428.00 in proceeds, minus $11,750.40 in expenses, for a total of $33,677.60.

The final issue is whether the district court erred in its award of interest to Farmers. Upon Farmers' motion to amend judgment, the court ordered PCA to pay interest on Farmers' judgment in the amount of $33,677.60 at the judgment rate beginning January 1, 1985. This resulted in PCA owing $7,577.46 for interest at 15% between January 1, 1985, and July 1, 1986, K.S.A. 1987 Supp. 16-204(c)(1); and $2,615.78 for interest at 10.5% between July 1, 1986, and March 27, 1987, at the current rate pursuant to K.S.A. 1987 Supp. 16-204(c)(2). Interest accrued from March 27, 1987, at the applicable statutory rate pursuant to K.S.A. 1987 Supp. 16-204(d), (e).

An unliquidated claim for damages generally does not draw interest prior to judgment or some other means of liquidation. *Kearney v. Kansas Public Service Co.*, 233 Kan. 492, 505, 665 P.2d 757 (1983). Farmers does not argue on appeal that the damages were liquidated, but contends the general rule should not apply under the circumstances. In *Lightcap v. Mobil Oil Corporation*, 221 Kan. 448, 467-69, 562 P.2d 1, *cert. denied* 434 U.S. 876 (1977), we held the district court has the discretion to award prejudgment interest on an unliquidated claim when the defendant has had use of the money, the plaintiff has been deprived of the use of the money, and the order is necessary to award full compensation.

PCA argues that, even if prejudgment interest is allowed, it should not have been at the judgment rate under K.S.A. 1987 Supp. 16-204, which clearly applies only to interest accruing

after judgment, but rather at the prejudgment rate provided by K.S.A. 16-201, which reads as follows:

"Creditors shall be allowed to receive interest at the rate of ten percent per annum, when no other rate of interest is agreed upon, for any money after it becomes due; for money lent or money due on settlement of account, from the day of liquidating the account and ascertaining the balance; for money received for the use of another and retained without the owner's knowledge of the receipt; for money due and withheld by an unreasonable and vexatious delay of payment or settlement of accounts; for all other money due and to become due for the forbearance of payment whereof an express promise to pay interest has been made; and for money due from corporations and individuals to their daily or monthly employees, from and after the end of each month, unless paid within fifteen days thereafter."

The Kansas Judicial Council referred to *Lightcap* in stating that prejudgment interest is allowed under K.S.A. 16-201 for unliquidated damages under certain circumstances. Kansas Benchbook, p. 268c (1983 Supp.) The district court properly exercised its discretion in ordering the interest, but it used the wrong statutory rate. The correct statutory interest rate was 10% per annum pursuant to K.S.A. 16-201. The date at which it ordered the prejudgment interest to accrue, January 1, 1985, is appropriate as the testimony showed the cattle in Minnesota were sold between November 1984 and January 1985.

This case is affirmed on all issues except percentage of interest. Interest is awarded at 10% per annum pursuant to K.S.A. 16-201. Farmers is thus entitled to $33,677.60 plus 10% interest from January 1, 1985.