[No. 38347.    Department One.    December 15, 1966.]

DONALD K. MEISSNER, *Appellant*, v. SIMPSON TIMBER COMPANY *et al., Respondents.**

*Reported in 421 P.2d 674.

*Torbenson, Thatcher, Stevenson & Burns,* for appellant.

*Ryan, Askren, Carlson, Bush & Swanson,* for respondent.

BARNETT, J.†—Plaintiff Donald K. Meissner appeals from an adverse ruling made upon a motion for summary judgment whereby his cause against defendant Simpson Timber Company was dismissed.

The complaint alleged two causes of action, both of which were dismissed under motions for summary judgment. The dismissal of the second cause of action, which sounded in unjust enrichment, is not appealed from by plaintiff. Plaintiff's first cause was predicated upon an alleged promise by defendant company to pay to him, as compensation for an assignment of his rights in an invention, an extraordinary bonus and 20 per cent of certain royalty income. Defendant made two separate motions for summary judgment against this cause of action. The first motion was denied. The second motion, made upon different grounds from the first, was granted by the trial court upon two grounds: (1) that there was insufficient evidence from which it could be found that a contract was made by defendant to pay royalties to plaintiff; and (2) that, even if such evidence were sufficient to establish a contract, it could not be considered because of the limitations imposed by the parol evidence rule. Determining that no genuine issue of fact was involved in the controversy, the court dismissed plaintiff's cause of action with prejudice.

■ See Am. Jur. 2d, Contracts § 20.

---

†Judge Barnett is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

■■■■ The object and function of summary judgment procedure is the avoidance of a useless trial. *Balise v. Underwood,* 62 Wn.2d 195, 381 P.2d 966 (1963). A summary judgment is properly granted if the pleadings, affidavits, depositions or admissions on file show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. *Balise v. Underwood, supra; Capital Hill Methodist Church of Seattle v. Seattle,* 52 Wn.2d 359, 324 P.2d 1113 (1958); Rule of Pleading Practice and Procedure 56(c), RCW vol. 0. In ruling upon such motion, it is the duty of the trial court to consider all evidence and all reasonable inferences therefrom most favorable to the nonmoving party. *Reed v. Streib,* 65 Wn.2d 700, 399 P.2d 338 (1965); *Balise v. Underwood, supra.* If, from this evidence, reasonable men could reach only one conclusion, the motion should be granted. *Balise v. Underwood, supra; Wood v. Seattle,* 57 Wn.2d 469, 358 P.2d 140 (1960).

In the following narration, we have endeavored to relate the pertinent facts most favorable to the plaintiff.

Plaintiff Meissner was employed by defendant Simpson Timber Company in various sales capacities during the period of March, 1950 through March, 1963. Early in 1952, plaintiff, along with one Donald Proudfoot, developed a process of fabricating a wood fibre accoustical tile which had the esthetic appearance of fissured mineral tile, and which seemed to have significant economic potential. Plaintiff's development became known to defendant company, which expressed an interest in obtaining an assignment of the coinventors' rights therein. Plaintiff was informed by his personal friend, one Charles Devlin, who was an officer of defendant corporation, that the company desired such assignment. In the words of plaintiff, as he testified by deposition:

> He [Devlin] said, "They [defendant] will probably do several things for you. This isn't a commitment but, as an example, they will probably give you,—maybe assure you of a permanent career or something like that, possibly an extraordinary bonus or a royalty arrangement.

They probably won't give you anything for anything that Simpson makes, because they just don't do that. But if they license somebody on the outside, they probably will be as lenient, if not more so, than the agreement our fellows have in the lab."

Subsequent to this conversation, on April 22, 1952, plaintiff and Proudfoot executed an instrument entitled "Agreement of Assignment of Invention" wherein it was stated:

[F]or and in consideration of the sum of One Dollar ($1.00) and other valuable consideration . . . we have sold, assigned and transferred, and by these presents do sell, assign and transfer unto said Simpson Logging Company the full and exclusive right to said invention . . . and

We agree, upon request . . . to make application for letters patent on said invention or improvements . . . and shall assign all such applications to Simpson . . . and . . . on request, execute all papers, including an assignment of any such invention or improvement, and do all that may reasonably be required in order to protect the rights of Simpson . . . .

The record does not disclose that, prior to the execution of the above assignment, the defendant promised to pay to plaintiff, as compensation, any royalties which might obtain from a licensing of the invention. Nor, patently, does the assignment instrument itself make mention of this mode of compensation.

Shortly thereafter, defendant company notified plaintiff that it desired to have a patent application filed. This request resulted in the filing of application for letters patent.

The record contains evidence making occasional reference to an "executive meeting" which allegedly was held by several corporate officers during this period of time—the spring of 1952. There is also evidence that, at this meeting, those present agreed among themselves that the coinventors should receive, as compensation for their assignment, an extraordinary bonus plus 20 per cent of certain royalty income.

Plaintiff filed an affidavit during the pendency of this action, swearing, *inter alia,* that Devlin:

█rally promised . . . that I would receive an extraordinary bonus no less than 20% of royalty income received by the Defendant, the same as received by men in research.

The alleged "oral promise" to which plaintiff referred in this affidavit, necessarily was made, if at all, during the course of a conversation held between plaintiff and Devlin in the fall of 1952, subsequent to the aforementioned assignment, when plaintiff and his wife were dinner guests at the Devlin residence. It is this conversation upon which plaintiff relies to establish the existence of a promise on the part of defendant. For this reason, we quote extensively from plaintiff's deposition wherein this event is discussed.

Q. [by Mr. Howard, counsel for defendant] Now going to the period after the execution of this assignment, when was the next time that you had any conversation or communication with anyone in Simpson concerning compensation?

A. . . . Sometime later . . . Mr. Devlin called me to come out to have dinner and bring my wife, at his house. During the course of the evening . . . he said, "You can rest assured that your having had confidence in the company, in signing over the invention, that you are going to be compensated nicely for this."

He said they had . . . an Executive Board meeting and he said, "You will be happy to learn that for having assigned the whole thing over to them . . . that it was agreed there was to be an extraordinary bonus; . . ."

He said that if this brought some sales . . . there would be no question but what I would get raises in the future . . . and that I wouldn't get any less percentage —outside royalty income—than they did at the lab; and I already knew that this would be twenty per cent, but he said it would be no less.

. . .

Q. Did he indicate when that meeting took place?

A. No . . . I don't think he . . . told me what day it was, except to tell me that he was tickled to let me know that for having taken his advice, the company had gone somewhat the route that he thought they would.

. . .

Q. Did he indicate who was present, at that meeting?

A. No, except that he indicated it was official enough that he could tell me now,—Chuck was very conservative and a very intelligent man, so I am certain he wouldn't, —he didn't make nebulous promises. He was pretty factual. I am certain he wouldn't have said this as a commitment if he hadn't been authorized,—he wouldn't have taken it upon his own to authorize this.

. . .

Q. Did he indicate who was present in the meeting?

A. I don't know . . . . All I got out of the gist of the conversation, which was ten years or so ago was "You will be tickled to know that after taking my advice in signing this assignment paper that the company had a meeting and have agreed to do some nice things for you" and then he started to just generally outline what they were.

. . .

Q. [T]o stay with the dinner at the Devlins, apparently then Mr. Devlin was reporting to you that this meeting had taken place?

. . .

A. Yes.

Q. And what had occurred at that meeting?

A. Yes, that is right.

Q. Did he indicate whether he had been present at the meeting?

A. No . . . all I can say is maybe you can assume he was. But he did say, "I am glad to tell you that the company had a meeting and they decided on these points" et cetera. . . .

Q. Did Mr. Devlin tell you that he had been instructed to give you this information?

A. No. The general atmosphere of the dinner and the conversation was just one to—not to tell me that he was instructed by the company to tell me this and that, I am sure it would have been in the office—but as I took it, and as I think you would take it, that having signed the thing over to the company, lock, stock and barrel, and having faith in the company, that he was glad to report that for having taken his advice, the company had agreed to a method of compensation, and then generally outlined it.

I couldn't say rightfully that he was instructed to do it.

Q. This was more, then, like a good friend passing along some good news that he had received?

A. That is right. I would say that was probably it.

In March of 1955, plaintiff and Proudfoot were informed by the company that the sum of $10,000 had been appropriated as compensation for the assignment; and that they should agree between themselves on a division of this amount. The coinventors thereafter agreed on a sixty-forty division, the larger share to go to plaintiff. Shortly thereafter, plaintiff and Proudfoot were advised that an instrument entitled "Assignment of Application for Patent" was ready for their execution, and that, after they had signed this document, they would receive checks in the respective amounts of $6,000 and $4,000 as "full compensation" for their assigned interests. On March 17, 1955, this instrument was executed by plaintiff and Proudfoot. Several days later, plaintiff received a check for $4,865 ($6,000, less withholding) from defendant, along with a letter reciting that it was "full compensation" for the assignment. Plaintiff retained the check, and expressed written gratitude therefor to the company.

In 1958, defendant granted a license to Johns-Manville Corporation, allowing the latter to produce the acoustical tile invented by plaintiff and Proudfoot. Since that time, other nonaffiliated companies were granted a similar license. Plaintiff instituted suit in 1963 for the recovery of 20 per cent of the royalties obtaining as a result of the granting of these licenses.

Since plaintiff takes no appeal from the dismissal of his unjust enrichment cause of action, his right to recover the royalties is dependent upon the existence of a contractual obligation on the part of the defendant. It is noted that plaintiff alleged by affidavit that he was "orally promised" by defendant that he would be paid royalties. This bare allegation, he argues, is sufficient to raise a genuine issue of fact as to whether a binding promise was made to him by defendant. This, however, is not the law. The same argument was made and rejected in *Reed v. Streib,* 65 Wn.2d 700, 706, 399 P.2d 338 (1965). There, we said:

Davis [the nonmoving party on a motion for summary judgment] was not justified in relying upon such bare allegations to carry him to trial. . . . The purpose of

the summary judgment rule is to permit the court to pierce such formal allegations of facts in pleadings when it appears that there are no genuine issues. . . . Affidavits enjoy no special immunity and will be "pierced" under the same circumstances. . . .

As we stated in *Lundgren v. Kieren,* 64 Wn. (2d) 672, 393 P. (2d) 625 (1964):

" . . . the court pierces the formal allegations pleaded. Each party must furnish the *factual evidence* upon which he relies. . . ." . . . .

. . .

The whole purpose of summary judgment procedure would be defeated if a case could be forced to trial by a mere assertion that an issue exists without any showing of evidence. 3 Barron and Holtzoff, Federal Practice and Procedure § 1235, p. 141.

From a thorough examination of the record, we have determined that, if an oral promise was made to plaintiff, it must be found in the dinner conversation which transpired between himself and Devlin in the fall of 1952. It must be borne in mind that plaintiff, nowhere in the record, denies the fact of the conversation, or that his depositional testimony concerning it was not a truthful narration of the discussion which therein ensued.[1]

■■ The ultimate question thus becomes: Assuming the fact of the conversation, and the truth of the statements therein made, are these facts sufficient to raise a genuine issue as to the existence of a promise by defendant to pay plaintiff the royalties he seeks in this lawsuit?[2] It is our considered opinion that they do not. Plaintiff himself testified that Devlin's statement to him—that the company officers had agreed among themselves to pay him royalties in the event the invention was later licensed—was "like a good friend passing along some good news that he had received." Devlin's report to plaintiff of what the "executive

---

[1]Because of Devlin's death prior to the commencement of this lawsuit, no evidence of his version of the critical conversation is contained in the record.

[2]The issue of whether there was consideration for the alleged Devlin promise is not raised by either party, and we have decided the case upon the issues raised.

committee" had agreed to do does not rise to the dignity of a promise. In *Plumbing Shop, Inc. v. Pitts,* 67 Wn.2d 514, 517, 408 P.2d 382 (1965), we adopted the Restatement of Contracts, § 2(1) (1932) definition of a "promise", saying: "A promise is an undertaking, however expressed, either that something shall happen, or that something shall not happen, in the future."

■ The evidence discloses, at most, that defendant, at one time, had *intended* to pay royalties to plaintiff, and that this intention was disclosed to him. But an intention to do a thing is not a promise to do it. An "intention" is something formed in the mind of a man; a "promise" is an express undertaking or agreement to carry the purpose into effect. *E. I. DuPont De Nemours & Co. v. Claiborne-Reno Co.,* 64 F.2d 224 (8th Cir. 1933), 89 A.L.R. 238; *Holt v. Akarman,* 84 N.J.L. 371, 86 Atl. 408 (1913).

We agree with the argument tendered in defendant's brief that:

> The deliberations, if any, of the respondent's [defendant's] Executive Committee were not promises or agreements with the appellant [plaintiff]. Even if communicated to him, they were not promises or commitments to him. Under the circumstances testified to by the appellant, the respondent, without violating any duty to the appellant or right possessed by him, could have changed, modified or revoked its alleged reported deliberations without the appellant's consent, or even his knowledge.

Reasonable men, on this evidence, could not conclude that defendant had promised plaintiff to pay royalties to him. Conceding the truth of the allegations, then, we hold that they are without legal probative force. On trial, such evidence would compel the direction of a verdict in favor of the defendant. *Flanagan v. Northern Lumber Co.,* 17 F.R.D. 432 (N.D. New York 1954). The summary judgment was properly entered.

Judgment affirmed.

ROSELLINI, C. J., HILL, FINLEY, and HUNTER, JJ., concur.