NORFOLK PRODUCTION CREDIT ASSOCIATION, APPELLANT, V.
BANK OF NORFOLK, APPELLEE.

371 N.W.2d 276

Filed August 2, 1985.   No. 84-442.

James T. Gleason, for appellant.

Jerrold L. Strasheim, William G. Dittrick, and Terrence L.
Michael of Baird, Holm, McEachen, Pedersen, Hamann &
Strasheim, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, SHANAHAN,
and GRANT, JJ.

BOSLAUGH, J.

This was an action for conversion brought by the Norfolk
Production Credit Association (PCA), plaintiff, against the
Bank of Norfolk (Bank), defendant. After a bench trial the
plaintiff's petition was dismissed. In this appeal the plaintiff has
assigned as error the trial court's findings (1) that the PCA had
released its security interest in the collateral and the proceeds
thereof; (2) that the PCA had failed to prove that a conversion
occurred; (3) that the debtor's notes to the PCA were not due or
in default; and (4) that the failure to find that the PCA's right to
the proceeds of its collateral had priority over any rights of the
Bank.

The record demonstrates that on April 22 and June 1, 1981,
the PCA extended credit to Philip G. Schmer, totaling
$320,000, in the form of a "Renewal Note" and an "Additional
Note" in order to finance his farming and cattle business. The

notes were payable on or before October 5, 1981. As collateral, the PCA perfected a security interest in all of Schmer's livestock to be purchased, all feed and grain, all owned or thereafter acquired machinery, equipment, and tools as described, and all crops as described.

Schmer also maintained and operated a trucking business, Philip G. Schmer, Inc., which was financed by the Bank in the amount of $317,644.88. This line of credit was evidenced by five separate notes due on September 15, 1981, or on demand. As collateral, the Bank retained a security interest in "[a]ll trucking equipment including but not limited to truck tractors, trailers, inventory, supplies, tools and equipment, sheds and buildings, all contracts and contract rights, and accounts now owned or hereafter acquired." At no time did the Bank have a secured interest in any farm-related property, nor did the PCA have a secured interest in any trucking-related property.

On October 2, 1981, certain items of personal property owned by Schmer and Philip G. Schmer, Inc., were sold at an auction sale conducted by Taylor & Martin, Inc. The sale was conducted pursuant to an "Auction Agreement," signed by Schmer, which provided in part: "6. Seller agrees that if one or more, individuals, and or corporations, and or firms, own the property listed on one or more auction agreements signed by and between the Seller and Agent, the proceeds therefrom may be commingled and used to pay guarantees, costs and commissions."

At the time of the sale, Philip G. Schmer, Inc.'s, notes were due and owing to the Bank. Consequently, the Bank had arranged with Taylor & Martin, Inc., that it was to receive all proceeds resulting from the sale of its collateral directly from Taylor & Martin, Inc. Additionally, Schmer had received consent of the PCA to conduct the sale some 30 to 45 days beforehand.

After the auction sale Taylor & Martin, Inc., prepared a report of the sale on which it indicated the property sold and the amount received therefrom, some of which was prefaced with a "T" or "F" indicating whether it was trucking-related or farm-related property. The total proceeds received from the sale were $681,268. From this, Taylor & Martin, Inc., issued the

following checks: $106,999.42 to the Commercial Savings Company; $139,894.94 to Security National Bank; $14,612.84 to John Deere Co.; and $252,170.60 to the Bank. After subtracting its commission and advertising payments, Taylor & Martin, Inc., issued a final check in the amount of $108,319.88 to Philip Schmer, Inc., for the net proceeds of the sale. This check was received by Schmer and deposited in the account of Philip G. Schmer, Inc., at the Bank on or about October 23, 1981.

On October 26, 1981, Schmer delivered two checks to the PCA, totaling $80,000, payable from the account of Philip G. Schmer, Inc. These checks were returned unpaid by the Bank, marked "See Maker." Prior to the time these checks were presented for payment, a "hold" had been placed on the Philip G. Schmer, Inc., account; at that time the account had a balance in excess of $110,000. On November 12, 1981, the Bank debited the account of Philip G. Schmer, Inc., to pay the outstanding obligation of the corporation to the bank.

In the order dismissing the petition, the district court found that the PCA released any and all security interest it may have had in the property sold by Schmer; that when the $108,319.88 check payable to Philip Schmer, Inc., was deposited in the account of Philip G. Schmer, Inc., the Bank, through the use of its term "freeze," legally offset an amount in the account of Philip G. Schmer, Inc., sufficient to satisfy the debt of Philip G. Schmer, Inc., to the Bank; and that the PCA had failed to prove that a conversion had occurred. The assignments of error all relate to this order.

The plaintiff's theory of the case is premised on Neb. U.C.C. § 9-306(2) (Reissue 1980), which provides:

(2) Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and *also continues in any identifiable proceeds including collections received by the debtor*.

(Emphasis supplied.) Of specific concern here is the italicized language above.

The plaintiff cites *Rudio v. Yellowstone Merchandising, etc.*, 200 Mont. 537, 652 P.2d 1163 (1982), in support of its theory. In *Rudio* the court held:

> Whether or not Rudio waived his security interest has no bearing on his right to the proceeds of the sale as against competing creditors such as MMI. In, *In Re Mid State Wood Products Company* (D.Ill.1971), 323 F.Supp. 853, the Federal District Court held:
>
> > "Section 9-306(2) of the code expressly reserves the right to proceeds notwithstanding authorization to sell the primary collateral. Whether the sale was authorized is made determinative only of the secured party's right to follow the collateral after sale affecting his priorities as against the purchaser, *but in no manner affects his interest in the retained proceeds as against competing creditors.* This construction of the statutory provision is emphasized in the Official Code Comment upon that provision. See UCC, Official Code Comment, section 9-306(2) at par. 2. . .
> >
> > "As previously discussed, the Uniform Commercial Code is explicit in preserving the priority of the secured party to the proceeds notwithstanding his consent to the sale of the primary collateral and further notwithstanding his consent to the debtor's unrestricted use and disposition of these proceeds so long as they remain identifiable. See UCC sections 9-306, 9-205 and the Official Code Comments upon these sections.
> > . . . ."

(Emphasis in original.) 200 Mont. at 546-47, 652 P.2d at 1168-69. The plaintiff contends that since the "PCA had a continuously perfected security interest in the primary collateral <u>and its proceeds</u> . . . that security interest was not afffected [sic] by the sale of the collateral. Moreover, the proceeds remained at all times identifiable in the Philip G. Schmer, Inc. corporate account by virtue of the freeze." Brief for Appellant at 9.

While the funds which the plaintiff claims may have been in the Philip G. Schmer, Inc., account, whether those funds were "identifiable proceeds" as contemplated by § 9-306(2) is a different question.

Section 9-306(2) provides that a security interest continues in the proceeds of the sale of collateral *if those proceeds can be identified. C. O. Funk & Sons, Inc. v. Sullivan Equip., Inc.*, 89 Ill. 2d 27, 431 N.E.2d 370 (1982). We paraphrased that section in *Ceres Fertilizer, Inc. v. Beekman,* 209 Neb. 447, 451, 308 N.W.2d 347, 350 (1981), where we said: "Neb. U.C.C. § 9-306 (Reissue 1971) provides that in spite of the sale or other disposition by the debtor of the collateral, the security interest may continue in such property and in any identifiable proceeds received by the debtor."

A secured creditor's right to proceeds under this section is generally dependent on the ability to trace and identify the fund as his property. See J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code § 24-6 (2d ed. 1980). In *Howarth v. Universal C.I.T. Credit Corporation*, 203 F. Supp. 279 (W.D. Pa. 1962), the court held that a secured party must identify the source of money in a bank account. "The court may not assume the source of the money in the bank. The burden is upon [the secured party] to trace cash proceeds received by [the debtor] from the disposition of secured collateral into the bank deposits." *Id.* at 282.

In this case not only were the funds claimed by the plaintiff evidenced by a check written to Philip Schmer, Inc., and deposited in the corporation's account but the plaintiff made no showing that the source of those funds was proceeds from its collateral. Rather, the check represented the *net* proceeds from an auction sale of collateral, which predominantly secured the defendant. The evidence indicates that at the time of the sale all of the proceeds were commingled and checks written to various creditors from one pool. The evidence does not support a finding that the $108,319.88 check to Philip Schmer, Inc., represented proceeds from the sale of the plaintiff's collateral. Furthermore, Schmer, the individual, as distinguished from Philip G. Schmer, Inc., the corporation, received no proceeds from the auction sale.

Section 9-306(1) provides in part, " 'Proceeds' includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds." In *Terra Western Corp. v. Berry and Co.*, 207 Neb. 28, 295 N.W.2d 693 (1980), this court

emphasized the receipt requirement contained within the definition of "proceeds," at least as it referred to insurance proceeds. This court said: "An examination of the language of the statute shows that proceeds of an insurance policy covering destroyed property or other proceeds do not become 'proceeds' within the meaning of the code until the money 'is received.' Patently, this means receiving by the owner." *Id.* at 33-34, 295 N.W.2d at 697.

Since the plaintiff failed to prove that the defendant had received "identifiable proceeds" from the sale of the plaintiff's collateral, it is unnecessary to address the remaining issues.

The judgment of the district court is affirmed.

AFFIRMED.

CAPORALE, J., not participating.