[No. 54949-4. En Banc. September 28, 1989.]

CENTRAL WASHINGTON BANK, *Appellant,* v. MENDELSON–
ZELLER, INC., *Respondent.*

*Carlson & Drewelow, P.S.,* by *Allan Galbraith,* for appellant.

*Paul A. Barrett* and *Gregory S. Sergienko* (of *Barrett, Hale & Gilman*), for respondent.

*Daniel B. Ritter* on behalf of Washington Bankers Association, amicus curiae for appellant.

CALLOW, C.J.—This is a conversion action involving competing claims to crop proceeds under Article 9 of the Uniform Commercial Code as reflected in RCW 62A.9–101 *et seq.* The trial court entered summary judgment in favor of the defendant, Mendelson–Zeller, Inc. (MZ), and against the plaintiff, Central Washington Bank (Bank). We reverse.

The facts are undisputed. Robert and Julia Stirling owned and operated several apple orchards in Grant County. In mid–1983 the Stirlings filed for relief under chapter 11 of the Bankruptcy Code, acting as debtors in possession of their bankruptcy estates. The Stirlings then

entered into an agreement with Central Washington Bank in which the Bank agreed to finance the Stirlings' growing expenses for their 1984 crop. As collateral, the Bank retained a security interest in the crop and its proceeds. The Bank perfected its interest by filing a financing statement with the Washington State Department of Licensing on December 30, 1983.

Under the terms of the agreement, the Stirlings were required to "properly and timely, in a first-class husbandlike manner . . . thin, mature, harvest, transport to market, wash, sort, grade, pack, and sell the crop." They were also required to obtain additional financing for these expenses from a reputable financing institution to be approved by the Bank. Any security interest given this subsequent financier was to be subordinate to the Bank's security interest.

Pursuant to the Bank's requirements, the Stirlings entered into a handling and financing agreement with Premium Packing and Storage, Inc. (Premium). Premium operated as a commission merchant. Under the standard contract entered into with the Stirlings and other growers, Premium accepted fruit on consignment for purposes of processing and sale in return for a commission, and advanced the growers their costs of harvesting and hauling the fruit to Premium's warehouse. Title remained in the growers, subject to a security interest granted to Premium.

Aside from its standard contract, Premium entered into a separate financing and handling agreement with the Stirlings in which Premium *inter alia* agreed to process and market the Stirlings' 1984 crop and received a security interest in the crop to secure payment of its commission and advances. In accordance with the Bank's requirement, Premium's security interest was expressly made subordinate to the Bank's. This agreement was approved by the Bankruptcy Court.

Unknown to the Bank, Premium had an exclusive sales agent agreement with MZ, a California corporation, under which MZ performed Premium's marketing functions for a

commission. MZ sold the apples on credit and collected payment from the buyers in the form of checks or, in international sales, drafts drawn under a letter of credit. The agreement between Premium and MZ was approved by the growers in their standard contracts with Premium. However, the Premium–MZ agreement was not mentioned in the approved separate agreement Premium had with the Stirlings. In addition to performing marketing services, MZ agreed to finance Premium's business operations. Based on the number of bins of fruit handled each week, MZ advanced Premium funds for picking, hauling and packing expenses. Premium retained the packing advances and distributed the picking and hauling advances to the growers. As security for MZ's commission and the advances, Premium granted MZ a security interest in the crops it handled. Premium warranted that it could deliver title to the crops free of any liens or encumbrances. MZ did not search the public records and was unaware of the Bank's prior security interest in the Stirlings' crop. MZ did not file a financing statement.

The gross proceeds from the 1984 crop exceeded $900,000. MZ retained approximately $42,000 as sales commission and brokerage fees, and approximately $366,000 as repayment of the advances made to Premium, remitting the remainder to Premium. Premium deducted its commission and remitted the remaining proceeds to the Bank and Stirling. A deficiency in the principal amount of $99,061.53 remained on the debt owed the Bank.

The Bank brought this conversion action against Premium and MZ, claiming a right to the proceeds they retained by virtue of a superior security interest. The parties submitted cross motions for summary judgment. Premium did not appear for the hearing on these motions and the Bank was granted summary judgment against Premium. Premium has not appealed and is not a party before this court.

The trial court granted MZ's motion for summary judgment, ruling that the Bank was only entitled to net proceeds. The Bank appealed the order granting summary judgment in MZ's favor and the denial of its cross motion for summary judgment. We accepted certification.

The arguments presented by the parties raise two issues: (1) Does the Bank's security interest in the proceeds have priority over MZ's; and (2) if so, does the Bank's security interest extend to the gross proceeds or only the net proceeds after costs of processing and sale?

■ As this appeal arises out of an order granting summary judgment, we engage in the same inquiry as the trial court. *Hontz v. State,* 105 Wn.2d 302, 311, 714 P.2d 1176 (1986); *Wilson v. Steinbach,* 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). *Hontz.* All facts submitted and reasonable inferences therefrom are to be considered in favor of the nonmoving party. *Hontz; Wilson.*

## I

■ Initially the Bank had a superior security interest in the crop and proceeds. The Bank perfected its interest at the time it filed a financing statement. § 9–302.[1] The proceeds were initially accounts receivable when the apples were sold on credit, and then changed to negotiable instruments (checks and drafts) when the accounts were paid. As it is impossible to take possession of an intangible, a security interest in accounts can only be perfected by filing. § 9–302(1); 2 Washington State Bar Ass'n, *Washington Commercial Law Deskbook* § 17.3(1) (1982). MZ did not file a financing statement. Therefore, MZ did not perfect its

---

[1] Otherwise unidentified Uniform Commercial Code sections refer to RCW Title 62A.

interest until it took possession of the negotiable checks and drafts, *see* § 9–304(1), some time after the Bank had filed its financing statement. As the Bank was the first to file or perfect its interest, it has priority under § 9–312(5)(a).

MZ raises several theories, however, under which it contends the Bank lost its priority in the proceeds.[2]

### A. § 9–306(2)—Waiver

■ MZ argues that the Bank waived its security interest by requiring in the security agreement that the Stirlings sell the crop. Under § 9–306(2), a secured party relinquishes its security interest in the collateral if it consents to sale of the collateral. That section reads:

> [A] security interest continues in collateral notwithstanding sale, exchange or other disposition thereof *unless the disposition was authorized by the secured party in the security agreement or otherwise,* and also continues in any identifiable proceeds including collections received by the debtor.

(Italics ours.) However, this waiver extends only to the security interest in the collateral itself, preventing the secured party from recovering the collateral in the hands of the third party buyer; it does not extinguish the secured party's interest in the proceeds as against the debtor or competing creditors. *In re Mid State Wood Prods. Co.,* 323 F. Supp. 853, 857 (N.D. Ill. 1971); *In re Cullen,* 71 Bankr. 274, 279–80 (Bankr. W.D. Wis. 1987); *Vacura v. Haar's Equip., Inc.,* 364 N.W.2d 387, 392 (Minn. 1985); Official Comments 2(a), 3, RCWA 62A.9–306.

The Bank expressly authorized the sale of the crop in the security agreement. However, the Bank is not attempting to recover the apples from the ultimate buyers, nor is it suing MZ, as sales agent, for unauthorized sale of the collateral. *Clovis Nat'l Bank v. Thomas,* 77 N.M. 554, 425 P.2d 726

---

[2]Some of these theories were expressly rejected by the trial court and MZ has not appealed those rulings. However, a respondent, without cross-appealing, "may offer additional reasons in support of the judgment, even if the trial court rejected such reasoning." *Tacoma v. Taxpayers,* 108 Wn.2d 679, 685, 743 P.2d 793 (1987). Therefore, MZ is entitled to assert these claims on appeal.

(1967) and its progeny, cited by MZ, are inapposite. Rather, the Bank is seeking the proceeds retained by MZ. Unless MZ can show the Bank waived its security interest in the *proceeds,* the Bank's interest continues in those proceeds retained by MZ.

 MZ argues that by requiring processing and sale of the crop, the Bank expressly authorized MZ's consignment contract with Premium, the terms of which allowed MZ to first deduct its commission and advances, thereby waiving its security interest in the proceeds to that extent. MZ also contends the Bank impliedly waived its security interest by its conduct. Whether an authorization or waiver has occurred is generally a question of fact. *In re Klipfer,* 62 Bankr. 290, 295 (Bankr. S.D. Ohio 1986); *Benson Cy. Coop. Credit Union v. Central Livestock Ass'n,* 300 N.W.2d 236, 241 (N.D. 1980). However, when reasonable minds could reach but one conclusion from the evidence presented, questions of fact may be determined as a matter of law, and summary judgment is appropriate. *Davis v. Niagara Mach. Co.,* 90 Wn.2d 342, 348, 581 P.2d 1344 (1978); *Meissner v. Simpson Timber Co.,* 69 Wn.2d 949, 951, 421 P.2d 674 (1966).

> Waiver is the intentional relinquishment of a known right. It is necessary that the person against whom waiver is claimed have intended to relinquish the right, advantage, or benefit and his action must be inconsistent with any other intent than to waive it.[3]

*Wagner v. Wagner,* 95 Wn.2d 94, 102, 621 P.2d 1279 (1980); *see also Birkeland v. Corbett,* 51 Wn.2d 554, 565, 320 P.2d 635 (1958); *Bowman v. Webster,* 44 Wn.2d 667, 669, 269 P.2d 960 (1954). MZ relies on the security agreement provision to prove an express waiver. Merely requiring the grower to properly process and sell the crop is clearly not an express authorization for the grower to enter into future financing or consignment agreements which subordinate the Bank's interest. On the contrary, the security agreement

---

[3]To the extent they are not displaced, common law principles of waiver may be used to supplement the code. § 1–103.

here specifically stated that the Stirlings were not to create any further liens or security interests in the collateral without the written consent of the Bank. The Bank did authorize the granting of a security interest to Premium, but required that Premium's interest be subordinate. The facts show no express authorization for MZ's security interest.

■ Further, the Bank's actions do not indicate an implied intent to waive its security agreement. The "or otherwise" language in § 9–306(2) has been construed by numerous courts to allow for implied authorization from the parties' course of conduct; for example, where the secured party knows of the unauthorized disposition of the collateral and accepts the proceeds without objection. *See, e.g., Central Wash. Prod. Credit Ass'n v. Baker,* 11 Wn. App. 17, 19, 521 P.2d 226 (1974); *Planters Prod. Credit Ass'n v. Bowles,* 256 Ark. 1063, 511 S.W.2d 645 (1974); *Clovis Nat'l Bank v. Thomas, supra.* To constitute implied waiver, there must exist unequivocal acts or conduct evidencing an intent to waive; waiver will not be inferred from doubtful or ambiguous factors. *Wagner v. Wagner, supra; White Pass Co. v. St. John,* 71 Wn.2d 156, 163, 427 P.2d 398 (1967).

■ There is no evidence the Bank knew of MZ's involvement with the crop. The record indicates the Bank received the proceed checks directly from Premium. The Bank submitted an affidavit from its vice–president, who handled the Stirling account, stating he did not become aware that MZ was providing financing and marketing services or that MZ had retained some of the proceeds until after the Bank commenced litigation against Premium. The affidavit states the Bank understood Premium was the sales agent, and that is why it asked that Premium place the Bank's name on the proceeds checks as an additional payee. MZ has not disputed these facts. When a nonmoving party fails to controvert relevant facts supporting a summary judgment motion, those facts are considered to have been established. *Washington Osteopathic Med. Ass'n v. King Cy. Med. Serv. Corp.,* 78 Wn.2d 577, 579, 478 P.2d 228

(1970). MZ cites only to the fact that the Bank knew its financing was inadequate and that the Stirlings would have to seek additional financing from the packers and shippers, who would rely on the crop as security. That is undisputed. The Bank, in fact, authorized the financing from Premium, on the condition Premium's lien was subordinate. This does not indicate the Bank knew MZ was also involved in financing the crop. From the facts presented, we conclude a reasonable trier of fact could reach but one conclusion—the Bank did not by its conduct waive its security interest. MZ is not entitled to summary judgment on this issue; rather, summary judgment in favor of the Bank is proper.

However, as the trial court's grant of summary judgment may be upheld if MZ can prove any set of undisputed facts showing it had priority as a matter of law, we must address MZ's remaining claims.

### B. § 9–306(3)—Failure To Perfect Interest in Proceeds

Under § 9–306(3), a perfected security interest in the collateral continues to be perfected in the proceeds only for 10 days after the debtor receives the proceeds unless

(a) a filed financing statement covers the original collateral and the proceeds are collateral in which a security interest may be perfected by filing in the office or offices where the financing statement has been filed . . .; or

(b) a filed financing statement covers the original collateral and the proceeds are identifiable cash proceeds or instruments; or

(c) the security interest in the proceeds is perfected before the expiration of the ten day period.

MZ contends the Bank lost its perfection, and thus its priority, in the accounts receivable because it failed to file in California, the state where MZ's chief executive office is located, within 10 days of MZ's receipt of the accounts. In multiple state transactions involving accounts, the law of the jurisdiction where the debtor is located governs perfection. § 9–103(3)(b). The debtor is deemed located at his place of business, if he has one, or his chief executive office, if he has more than one. § 9–103(3)(d). The "debtor" is

"the person who owes payment or other performance of the obligation secured". § 9–105(1)(d). Here, the Bank did not know of the interest of MZ and the Bank's debtor is the Stirlings. As the Stirlings are located in Washington, this State's law applies. Under Washington law, the Bank was required to file with the Department of Licensing to perfect its interest in accounts. § 9–401(1)(b). The Bank previously made such a filing to perfect its interest in the crop. Under § 9–306(3)(a), the Bank's interest remained perfected in the accounts without need of further action on the Bank's part. Once the proceeds became instruments, the Bank's interest continued to remain perfected under § 9–306(3)(b). *See also* Washington Comments to 1972 Official Text Amendments, RCWA 62A.9–306 (Supp. 1988).

### C. § 9–307—Buyer in the Ordinary Course of Business

"A buyer in ordinary course of business . . . other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected . . ." § 9–307(1). MZ contends that it purchased the apples from Premium in the ordinary course of business and takes the proceeds free of the Bank's interest.

Section 1–201(9) defines a buyer in the ordinary course of business as

a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind . . .

This implies that a sale has taken place. *See* B. Clark, *Secured Transactions Under the Uniform Commercial Code* ¶ 3.4[2] (1980). A sale is defined as "the passing of title from the seller to the buyer for a price". § 2–106(1). It is undisputed that MZ did not buy or take title to the goods, but merely agreed to sell them on consignment in return for a commission. MZ's own contract with Premium states, "in no event is this agreement to be deemed or construed as a purchase of said crop by MZ . . ."

Moreover, a buyer in the ordinary course only takes free of an interest "created by his seller". § 9–307(1). MZ contends that Premium was its seller. Premium did not create the Bank's security interest, Stirling did. Therefore, even if MZ were a buyer in the ordinary course of business, it would not take free of the Bank's interest. *See* Clark ¶ 3.4[3].

### D. § 9–308—Purchaser of Instruments

Section 9–308 provides:

> A purchaser of chattel paper or an instrument who gives new value and takes possession of it in the ordinary course of his business has priority over a security interest in the chattel paper or instrument[.]

MZ contends it has priority under this section as it was a purchaser of the instruments received from the buyers to the extent it had a security interest in them. We disagree for several reasons.

Although, as MZ contends, the code defines "purchase" in part as "taking by . . . lien", § 1–201(32), MZ's security interest, or "purchase", was not created by the owners of the instruments, the Stirlings, but by Premium. Nor did MZ give new value for the instruments. MZ argues it gave new value by providing sales services and advances to Premium which were eventually received by the Stirlings. The loans and services given were not in exchange for the instruments themselves. At the time MZ received the instruments from the buyers, the money owed MZ by the Stirlings constituted a preexisting, unperfected secured debt. Taking a setoff in satisfaction of an antecedent debt does not constitute *new* value. *United States v. Handy & Harman,* 750 F.2d 777, 781–82 (9th Cir. 1984); *In re Dr. C. Huff Co.,* 44 Bankr. 129, 131 (Bankr. W.D. Ky. 1984). To rule otherwise would allow a commission merchant, who has a security interest in the collateral and who takes possession of the proceeds in the ordinary course of business as an agent, to bootstrap himself into priority over any superior secured creditors. *Cf. Handy & Harman.* This is not the type of transaction contemplated by § 9–308.

### E. § 9–309—Holder in Due Course

We also find no merit in MZ's argument that it has priority under § 9–309 as a holder in due course of the instruments.

> A holder in due course is a holder who takes the instrument
> (a) for value; and
> (b) in good faith; and
> (c) without notice that it is overdue or has been dishonored or of *any* defense against or claim to it on the part of *any* person.

(Italics ours.) § 3–302(1). Although the checks from the buyers were made payable to MZ, thus making MZ a "holder", *see* § 1–201(20), MZ was not accepting the instruments on its own behalf, but as an agent of the Stirlings, who were the owners of the instruments. *See generally* 35 C.J.S. *Factors* §§ 1, 12 (1960). Thus MZ was a holder of the instruments only for its ultimate principal, the Stirlings. Further, although MZ may not have had notice of the Bank's claim,[4] MZ had notice of both Premium's and the Stirlings' claims to the instruments. A holder must be unaware of *any* claim against the instrument, not just the claim being asserted. 4 W. Hawkland & L. Lawrence, *Uniform Commercial Code Series* § 3–304:01 (1984).

### F. Tracing

Finally, we find no merit in MZ's contention that the Bank must identify the bank account into which MZ placed the proceeds. § 9–306(2). The Bank is not attempting to assert a superior security interest in these specific cash proceeds against another creditor of Stirling or MZ. Compare § 9–306(4). Rather, the Bank seeks only a simple money judgment against MZ for its conversion of the cash proceeds of the Stirlings' apple crop. MZ converted these proceeds the moment it took the funds on its own account in satisfaction of the Stirlings' debt. See Restatement (Second) of Torts § 222A (1965). *See also Farmers State Bank*

---

[4] Mere filing under Article 9 does not constitute notice. § 9–309.

*v. Production Credit Ass'n,* 243 Kan. 87, 755 P.2d 518, 527 (1988) (discussing "identifiable proceeds" requirements under Kan. Stat. Ann. § 84–9–306(2) (1983) in terms of the creditor receiving the proceeds—not with disposition after receipt); *United States v. Tugwell,* 779 F.2d 5, 8 (4th Cir. 1985) (appropriateness of action for conversion of proceeds); *United States v. Minster Farmers Coop. Exch., Inc.,* 430 F. Supp. 566, 571 (N.D. Ohio 1977); *Farmers & Merchants Nat'l Bank v. Fairview State Bank,* 766 P.2d 330, 334 (Okla. 1988); *American Nat'l Bank v. Cloud,* 201 Cal. App. 3d 766, 247 Cal. Rptr. 325, 330 (1988); *Nolin Production Credit Ass'n v. Camer Deposit Bank,* 726 S.W.2d 693, 702–03 (Ky. Ct. App. 1986). What MZ has since done with the proceeds is irrelevant.

## II

MZ contends that even if the Bank's interest in the proceeds has priority, that interest extends only to the net proceeds after payment of the costs of processing and sale.

MZ first asserts that the Bank is entitled only to the proceeds actually received by the debtor—in this case, the net proceeds. Section 9–306(1) defines proceeds as "whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds." There is no requirement in this section that the proceeds be received by the debtor. Subsection 2 of § 9–306 states that a security interest "continues in any identifiable proceeds including collections received by the debtor." The language of this section is unclear as to whether the phrase "received by the debtor" applies only to collections or to all proceeds, which includes collections.

There is a split of authority on whether a secured party's interest continues in proceeds received by someone other than the debtor. MZ cites cases which have construed the code to require that the proceeds be in the debtor's hands in order to be subject to a security interest. *See First Interstate Bank v. Arizona Agrochemical Co.,* 731 P.2d 746 (Colo. Ct. App. 1986); *Norfolk Prod. Credit Ass'n v. Bank*

*of Norfolk,* 220 Neb. 593, 371 N.W.2d 276 (1985). In *First Interstate,* however, the debtor had first received the proceeds and then transferred them to a third person. The court held the secured party was only entitled to what the debtor received from the third party in exchange for the original proceeds. Here, on the other hand, the Bank is attempting to recover proceeds which the debtor has never received. In this situation, the better interpretation is that the security interest continues in proceeds received by someone other than the debtor. *See Producers Cotton Oil Co. v. Amstar Corp.,* 197 Cal. App. 3d 638, 242 Cal. Rptr. 914 (1988); *Farnum v. C.J. Merrill, Inc.,* 264 A.2d 150, 156 (Me. 1970); *Production Credit Ass'n v. Melland,* 278 N.W.2d 780, 788 (N.D. 1979); *Baker Prod. Credit Ass'n v. Long Creek Meat Co.,* 266 Or. 643, 650, 513 P.2d 1129 (1973). To rule otherwise would frustrate the code's priority rules by allowing a creditor who, as here, gets possession of the proceeds prior to the debtor to take priority over an otherwise superior security interest in those proceeds. Such a rule would dry up secured lending and discourage the commencement of business activity. As one author observed: "In these unusual circumstances when the security interest in proceeds is needed most strongly by the secured party, it would be anomalous to cut off the security interest because of inartistic drafting which is at best ambiguous." R. Henson, *Secured Transactions Under the Uniform Commercial Code* § 6–1, at 198 (2d. ed. 1979).

MZ further argues that the U.C.C. definition of proceeds contemplates only net proceeds, or alternatively that its lien for sales commission and advances should be given priority in equity. MZ contends it would be unfair to allow the Bank to benefit from the handling and marketing services performed by Premium and itself, which substantially increased the value of the crop after it was grown. Principles of law and equity may be used to supplement the code, unless specifically displaced. § 1–103.

■ The plain language of the statutory definition of proceeds does not support MZ's claim. Proceeds are defined

as *"whatever is received* upon the sale, exchange, collection or other disposition of collateral or proceeds." (Italics ours.) § 9–306(1). Recently, in holding that Dairy Termination Program payments were proceeds, we recognized that proceeds are to be given a broad definition, citing the dictionary definition of "'whatever': 'anything . . . everything . . . no matter what . . . anything at all'". *Rainier Bank v. Bachmann,* 111 Wn.2d 298, 303, 757 P.2d 979 (1988) (quoting *Webster's Third New International Dictionary* 2600 (1976)).

Two decisions address whether U.C.C. proceeds includes gross proceeds, and both hold that it does. In *In re Estate of Philp,* 114 Ill. App. 3d 107, 110, 448 N.E.2d 535 (1983), the court held that a real estate broker's sales commission was included in § 9–306 "proceeds". The court relied on the fact that in § 9–504, dealing with the creditor's right to dispose of the collateral upon default, the word clearly refers to gross proceeds. The court reasoned that the Legislature would not have used the same word in two sections of the code and intended different meanings. In ruling that freight costs were included in proceeds, the court in *Johanson Transp. Serv. v. Rich Pik'd Rite, Inc.,* 164 Cal. App. 3d 583, 592, 210 Cal. Rptr. 433 (1985), held that proceeds "includes all economic components that go into the total amount received for the product", noting that to rule otherwise would limit the definition of proceeds to those portions of checks resulting from the efforts of a particular creditor. This would be inconsistent with the express language of the code.

Several of this court's pre–U.C.C. cases have addressed the priority between a chattel mortgage and a subsequent common law lien for services and materials furnished to process a crop. In *Cashmere Vly. Bank v. Pacific Fruit & Produce Co.,* 198 Wash. 363, 88 P.2d 579 (1939), a case involving virtually identical facts, a fruit grower obtained crop financing and gave the bank a chattel mortgage. As here, the grower was required to properly handle and market the fruit. Those services were provided by a packing

company, which attempted to deduct its handling expenses from the sale proceeds. The bank sued for conversion. The court refused to deviate from the statutory priority given a chattel mortgage, even for services which added value to the fruit, reasoning:

> [I]f we sustained the contention of appellant, any lien–holder or creditor of a chattel mortgagor, whose right is subordinate to that of the chattel mortgagee, for materials or services furnished in the care or preservation of the mortgaged chattels, could defeat the lien of the prior chattel mortgage by simply converting the mortgaged chattel.

*Cashmere Vly. Bank*, at 369–70. *Accord, Loudon v. Cooper*, 3 Wn.2d 229, 239, 100 P.2d 42 (1940).

This reasoning applies even more so under the code. MZ urges us to grant it an exception to the code's priority rules by either defining proceeds as only net proceeds or by creating an equitable exception for those lien-holders who perform or finance services which add value to the collateral. The Legislature has recognized the apparent inequities in the priority rules and attempted to provide for them by creating exceptions for certain parties, for example purchase money secured parties, buyers in the ordinary course of business, or holders in due course. There are also statutory liens for those who provide materials or services with respect to the collateral which are granted priority under the code. *See* § 9–310. MZ has not shown it fits into an exception and expressly denies relying on any statutory lien.[5] To create new equitable exceptions to the priority rules would hinder the purposes behind Article 9—to simplify the law of secured transactions and create commercial certainty and reliance by creditors on Code provisions. *See*

---

[5]Even if priority under one of the statutory liens was available to MZ, we note that the majority of the proceeds MZ retained was not for its own services, but was repayment for the advances it made to Premium. As to those funds, MZ is solely in the position of a lender. It is clear that under the scheme of the code, MZ is the party who is in a position to discover if the collateral it will look to for payment of its debt is subject to a security interest. It can, as a subsequent lender, protect itself because it has the opportunity to acquire notice. The prior lender is protected only by its filing.

Official Comment, RCWA 62A.9–101; Clark ¶ 3.1[2]. Any further exceptions should be created by the Legislature. Moreover, crop handlers or their financiers always have the option of asking the primary lender for a subordination agreement to the extent of their lien. *See* § 9–316. The primary lender, after all, has an interest in seeing that the crop gets processed and sold and, with its priority achieved by its notice filing, is entitled to control arrangements with subsequent handlers and financiers to see that all interests are accommodated. We hold that the Bank's superior security interest extends to the gross proceeds.

MZ also requests attorney's fees on appeal on the ground the Bank's arguments are frivolous. No authority is cited for an award of attorney's fees, the Bank's arguments are not frivolous and attorney's fees are denied. Nor is there an issue as to damages, as MZ contends. The value of the converted proceeds greatly exceeds the remaining deficiency on the debt owed the Bank and the Bank is entitled to a judgment against MZ for the entire deficiency amount. We remand for entry of judgment consistent with this opinion.

UTTER, BRACHTENBACH, DOLLIVER, PEARSON, ANDERSEN, and DURHAM, JJ., concur.

DORE, J. (dissenting).—I dissent. Mendelson–Zeller, Inc. (MZ) is entitled to the reasonable value of its services and expenses. Otherwise Central Washington Bank (the Bank) would be unjustly enriched. As the California Court of Appeals very recently held, a claim based upon equitable principles of unjust enrichment can, in certain circumstances, supersede the rights of a secured creditor whose interest is fully perfected. *Producers Cotton Oil Co. v. Amstar Corp.,* 197 Cal. App. 3d 638, 242 Cal. Rptr. 914 (1988). I would hold that such an equitable claim prevails in this case.

The facts in *Producers* are analogous to the facts of the present case. There, Producers Cotton Oil Co. (Producers) financed a beet grower's farm operation and took in return

a security interest in the crop and its proceeds. The security agreement stated that no setoff or deductions were to be made by the buyer. The grower contracted to sell his beets to Amstar. This contract stated that Amstar would deduct from the sales price certain deductions. However, harvesting costs, which were later paid by Amstar, were not specified as deductions. Producers was aware of this buyer's contract with its stated deductions and sent a notice of Producer's assignment of crop proceeds to Amstar. The grower had the crops harvested. The grower asked Amstar to pay the harvester for his services. Amstar agreed to and did pay the harvester without receiving a subordination agreement from Producers. The usual practice of Amstar was to receive a subordination agreement from the financiers, however, in this case they inadvertently paid without one. In any event, Producers usual practice is to deny such requests for subordination. The grower never spoke to anyone at Producers about this payment for harvesting by Amstar. However, Producers was aware that harvesting services were being performed. Amstar remitted to Producers the proceeds of the sugar beet crop after deducting its miscellaneous expenses and harvesting expenses. Producers brought suit against Amstar, claiming that these deductions violated the security interest and constituted conversion of the proceeds.

The California Court of Appeals found an implied in law contract, or quasi contract, between Producers and Amstar which would allow Amstar to retain the harvesting costs it paid. *Producers,* 242 Cal. Rptr. at 926. The issue then became whether a claim based upon principles of unjust enrichment prevails over a claim based upon a properly perfected security interest pursuant to Article 9 of the Uniform Commercial Code. 242 Cal. Rptr. at 927. This conflict was one of first impression for the California courts. The court held:

> [W]hen a party possessing a security interest in a crop and its proceeds has knowledge of and acquiesces in expenditures made which are *necessary* to the development of the crop, and

ultimately benefits from the expenditures, a party who, through mistake, pays such costs without first obtaining subordination, is entitled to recover.

*Producers,* at 660.

Here the Bank agreed to finance the growers crop. The Bank took a security interest in the apple crops and its proceeds. Pursuant to this security agreement, the Bank required the grower among other things to obtain a written commitment from a reputable and viable financing source to advance funds to borrower for the harvest of the crops grown in 1984. In addition, the Bank required the grower to transport to market, wash, sort, grade, pack, and sell the crop grown and produced on borrower's orchards.

Pursuant to the Bank's requirements the grower entered into two separate agreements with Premium. The "Crop Financing and Handling Agreement" secured the grower's required harvest financing as required by the Bank. The security interest granted to Premium was subordinated to the Bank's interest. The second agreement, the "Standard Grower's Contract", carried out the Bank's mandate to market and sell the crop. Within this agreement was the approval of MZ as the exclusive sales agent for grower's fruit. Thus while the Bank was unaware of the MZ–Premium contract, it did request the services performed in this contract, *i.e.,* the packing, storing, selling and shipping of the apples. The MZ–Premium contract required MZ to wire funds to Premium based on the number of bins of fruit handled by Premium. Premium would then make advances to the grower. After the sale, MZ would deduct its expenses and advances.

Similar to Producers, which was unaware of the harvesting payment agreement, the Bank here was unaware of the services to be performed by MZ. Nonetheless, the Bank requested and benefited by these services performed by MZ. Thus similar to *Producers,* the present facts establish an implied in law contract, or quasi contract between the Bank and MZ which would allow MZ to retain its expenses and advances it paid to Premium. MZ advanced costs so

that the apple crop could be handled in a timely manner. The Bank specifically requested that these handling services be performed. Because the crop was handled, the Bank benefited by receipt of the proceeds of the sale. Thus, the facts satisfy the requirement that a recipient of services performed either requested or acquiesced in them and the requirement that the party to be charged with payment for service received a benefit. *Chandler v. Washington Toll Bridge Auth.*, 17 Wn.2d 591, 602–03, 137 P.2d 97 (1943); *Kerr v. King Cy.*, 42 Wn.2d 845, 854, 259 P.2d 398 (1953).

Under the common law equitable doctrine of implied in law or quasi contract, MZ had the right to recover from the Bank the handling costs by way of offset. Furthermore, Article 9 does not displace or prohibit the application of equitable principles. *See* RCW 62A.1–103. Therefore, like the California Court of Appeals, I would hold when a party with a security interest in a crop and its proceeds requests expenditures which are necessary to the development of the crop, and ultimately benefits from the expenditures, a party who pays such costs is entitled to recover. I would hold such an equitable claim exists here and would affirm the trial court.